UNITED STATES, Appellee,

v.

Glen A. TRIMPER, Captain U.S. Air
Force, Appellant.

No. 60,399.
ACM 26211.

U.S. Court of Military Appeals.

Aug. 23, 1989.

For Appellant: *Michael L. Sandul,* Esquire (argued); *Colonel Richard F. O'Hair, Colonel Leo L. Sergi, Major William J. Reichart, Captain Paul M. Dankovich.*

For Appellee: *Major Terry M. Petrie* (argued); *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni.*

## Opinion of the Court

EVERETT, Chief Judge:

At his general court-martial in February 1987, Captain Trimper, an Air Force judge advocate, contested specifications alleging wrongful use of cocaine and marijuana on divers occasions between May 1, 1985, and August 1, 1986, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Nonetheless, the members found him guilty and sentenced him to dismissal, confinement for 7 years, and total forfeitures. The convening authority approved these results, except for reducing the confinement to 5 years. On review below, the Court of Military Review affirmed the findings and most of the sentence—cutting the confinement even further, to 3 years. 26 MJ 534 (1988).

Through various issues, appellant complains in this Court about use of evidence of a private urinalysis allegedly commissioned by himself and of admissions concerning the urinalysis report that allegedly were made by him to an office co-worker. 27 MJ 463. Specifically, he complains that trial counsel did not disclose this evidence to the defense until just before the prosecutor used it during the trial; and he urges that, as a result, the evidence should have been suppressed. Instead, the challenged evidence not only served as a basis for trial counsel's cross-examination of appellant but also was admitted directly against him.

In our view, Trimper, by his own testimony, opened the way for the prosecution to use the contested evidence, even though it otherwise would have been inadmissible. Although we agree that trial counsel should have disclosed this evidence to the defense, *see* RCM 701(a)(2)(B) and Mil.R. Evid. 304(d)(1), Manual for Courts–Martial, United States, 1984, we conclude that the

military judge acted within his discretion in fashioning an appropriate remedy for this prosecutorial delict, *see* RCM 701(g)(3) and Mil.R.Evid. 304(d)(2)(B).

## I

As noted earlier, the time period in which Trimper allegedly used marijuana and cocaine was from May 1, 1985, to August 1, 1986. His wife and several of his close friends, many of whom themselves had been drug users and were testifying under grants of immunity, revealed various occasions when they had observed such use within that time frame.

During extensive direct and cross-examination, appellant asserted that all of the witnesses against him had lied and that all had compelling motives for their perjury. The steadfastness of his position in this regard can best be seen from the following limited colloquy with assistant trial counsel during cross-examination:

Q. I'd like to move on to talk about each of these witnesses' testimony, the testimony of the witnesses against you. Now, your ex-wife Kim has said that you used drugs over a period of time, and that you used cocaine on one occasion within the charged time frame. I take it you are denying those allegations?

A. Of course I'm denying them. They're not true. I have to deny them.

Q. And, essentially, you believe she's being untrue?

A. I know she's being untrue.

Q. How about Gary Nelson. He's made some allegations, not precisely the same time frame, but generally so?

A. He's a bold faced liar and a cheat and a thief.

Q. And Linda Dale, how about the allegations at Wasilla?

A. Lies.

Q. And Mike Dale?

A. Lies.

Subsequent to this exchange, appellant was questioned about incidents involving an unusually fast heartbeat rate. First, he was asked about an occasion when his girl-friend had mentioned to him, one night while lying in bed together, that his heart was pounding at a fast rate—an incident that appellant denied had ever happened. Then he was questioned about an occasion on which he reported to the emergency room because he feared he was having a heart attack; indeed, on that occasion his heart rate at the hospital was recorded in his medical file as 100 beats per minute. The relevance of this questioning became apparent in this colloquy:

Q. Are you aware that tachycardia or accelerated heart rate is a symptom of cocaine use?

A. I have heard that.

Q. Did you use cocaine *at anytime the night before* [the feared heart attack]?

A. *I have never used cocaine.*

(Emphasis added.)

Appellant repeated his expansive denial of drug involvement a short time later when he was discussing with assistant trial counsel his investigative interviews with OSI agents:

Q. Now, the time that you talked to them [OSI] initially, you were not aware that Linda Dale and Mike Dale were going to come forward with any testimony against you?

A. No, I was in, I had no idea who was going to lie about me.

Q. So, you denied some of the things that the other three people had said?

A. I denied everything anybody had ever said about any wrongdoing from the git-go, because *it's not true about any drug involvement.*

Q. What I'm getting at is, were you being cagey with them by not addressing these other instances?

A. What do you mean?

Q. If they asked you about these three individuals, were you denying and not giving them information about possible use on these other occasions?

A. There is no use, there is no use, there's no use, there's no use to talk

about. How could I be cagey about something that's not there?

* * * * * *

Q. Mr. Lazar [civilian defense counsel] asked you the question if between 1 May '85 and 1 August '86, you had used drugs, and your answer was, I believe . . .

A. Of course, it was no.

Q. You understand that *there's been some testimony about a couple of later dates? Are you being cagey with us?* We're talking specifically about Mike Dale and the other incidents up in Wasilla?

A. *Oh, you're talking about the ones that are outside the spec that was still brought in. They're false too, I'm not being cagey. I have not used drugs.* These five people who have come in here today, not today, the last few days, have lied, period.

Q. *So, you just deny outright that you have used drugs?*

A. *Yes, yes.*

(Emphasis added.)

Defense counsel objected to the last query, insisting that the prosecutor should have to restrain his questioning to events within the time frame charged. Civilian defense counsel acknowledged that the judge had ruled that the alleged incident at Wasilla, later in August, "falls within the parameters of the specification, those allegations." Defense counsel clarified his objection that the questioning seemed to go beyond that, as well.

After some further difficulty in this regard, defense counsel suggested, "Perhaps if we just keep the questions within the parameters of the specifications as has been alluded to [by] the military judge, and obviously, Captain Trimper understands what that means, it will be resolved." The military judge agreed and sustained the defense objection to broader questioning.

At an Article 39(a), UCMJ, 10 USC § 839(a), session called at the prosecution's request shortly thereafter, assistant trial counsel revealed that, in light of appellant's denial of drug use or, specifically, cocaine use at any time, the Government wanted to cross-examine appellant about a urinalysis performed on a specimen provided by Trimper at a local civilian hospital on September 4, 1986. Trial counsel produced the laboratory report of the analysis on that specimen.

Defense counsel objected. He pointed out that the specimen had been submitted outside the time frame charged; that the reliability of the laboratory analysis was unknown; and that there was no showing that the person who gave the specimen, identified as "Glen Trimper," in fact was appellant. As to the latter point, the prosecutor responded that appellant had made a statement to an office co-worker—Mrs. Dale, who already had testified against appellant in another respect—about submitting a specimen for the urinalysis. The prosecutor further argued that the fact that an Air Force officer would go to a local civilian hospital and voluntarily submit a sample for testing was probative—apparently, of his guilty state of mind.

Here, the military judge asked whether appellant's alleged statement to Mrs. Dale was on the list of statements given to the defense, and assistant trial counsel responded in the negative. Trial counsel explained that the Government had overlooked providing this statement because the prosecution had focused primarily on the laboratory report, not on the statement that had led them to it. In light of its oversight, the prosecution volunteered at that time not to cross-examine appellant about the statement.

The defense continued to press its objection to the laboratory report. Besides renewing its argument that the report was not an analysis of a specimen submitted by Trimper, the defense pointed out that the Government had been under an obligation—which it had failed to meet—to reveal the report pursuant to an outstanding discovery request for all laboratory reports regarding appellant. The prosecution resisted the notion that the defense request included this particular report; and it ar-

gued further that, even so, the remedy under RCM 701(a)(2) was a continuance to permit the defense to prepare, not exclusion of the evidence.

To delve into the defense contention that the report was not of appellant's specimen, the military judge called Mrs. Dale to testify. She stated that in September 1986 appellant had told her that he had taken a urinalysis "downtown" and that its results were "positive for cocaine and negative for marijuana."

Ultimately, the military judge overruled the defense objections to the laboratory report, to Mrs. Dale's testimony about appellant's statement to her in that connection, and to the Government's cross-examination of Trimper concerning these matters. He indicated that the report could be used to show appellant's cocaine use sometime shortly before September 4. Furthermore, he concluded that appellant's "submission to a private urinalysis test" was "somewhat inconsistent with his denial of" drug use—apparently permitting the Government to use the evidence in rebuttal.[1] As a basis for his rulings, the military judge made extensive findings of fact and performed, as well, the test for unfair prejudice mandated by Mil.R.Evid. 403.

In addition—referring expressly to Mil. R.Evid. 304(d)(2)(B) and impliedly to RCM 701(g)(3)—the military judge determined that exclusion of the challenged evidence was not necessary to remedy the late disclosure of the evidence to the defense. Specifically, he ruled:

(4) While I realize that the defense may have been somewhat surprised by the prosecution's attempt to use the 4 September urinalysis result and the additional statements by Mrs. Dale in this case, under all the circumstances of this case, including both the Government's and the defense's difficulty in securing full access to witnesses due to the witnesses' concerns about criminal liability, possible defamation suits, and other adverse personal impact, I conclude that the Government's late notification of Mrs. Dale's statement about the urinalysis should not cause exclusion of that evidence. I'm willing to grant a reasonable continuance to the defense so that they may pursue this matter to their satisfaction, but exclusion of such evidence is not a reasonable remedy under the circumstances, in my judgment.

Initially, the defense made a request for such a continuance but later withdrew it.

At this point, appellant's cross-examination continued with the following extensive colloquy:

Q. Earlier in your testimony you made two statements. First of all, stating I have not used drugs, and later I have never, or excuse me, earlier, I have never used cocaine. Do you recall those statements?

A. Yes.

ATC: I'd like to hand you Prosecution Exhibit # 3 for identification [a laboratory urinalysis report] and ask you to take a few moments to look at that three-page document. (The witness reviewed Prosecution Exhibit # 3 for identification).

Q. Do you feel you're fully familiar with that?

A. Yes.

Q. Captain Trimper, have you ever been to the Humana Hospital?

A. No.

Q. In Anchorage?

A. No.

Q. Have you ever met a Doctor Donald Rogers?

A. Is he military?

Q. It would appear that Doctor Rogers is associated with Humana Hospital?

A. No. Let me...never anybody saying I'm Doctor Rogers or something like that. I guess I could have run into him or something like that.

---

1. Moreover, according to the military judge the evidence also was "relevant in that it ... reflects upon the accused's self-professed attempt to gain expertise as to the urinalysis program and how it worked and his belie[f] in the validity of the Air Force urinalysis system."

Q. Captain Trimper, did you on the 4th of September of 1986, submit a urine specimen for cocaine and marijuana analysis?

A. No.

Q. I'm handing the witness a specimen bottle with what appears to be urine in it and a green lid on it. Could you tell us what the name is that appears on that specimen bottle?

A. The name says Trimper—Glen.

Q. Is Glen spelled with one "N" or two?

A. One "N."

\* \* \* \* \* \*

Q. Did you ever go to the Humana Hospital?

A. No, I've never been to Humana Hospital.

Q. Are you aware that this test report indicates that a Glen Trimper went to Humana Hospital on the 4th of September 1986, and submitted a urine sample which was tested positive for cocaine?

A. I glossed over that second page, may I see it again?

Q. Certainly.

A. Cocaine/Pos, Cannibis/Neg, Alcohol/Neg. This person, Glen Trimper, is a doper.

Q. And the final page is the statement of an individual, of a Doctor Rogers, is that correct?

A. Is that what that says?

Q. That's what it appears to be.

A. It's his signature on there. I don't see my signature on there.

\* \* \* \* \* \*

Q. You're saying that you're not the same Glen Trimper who submitted the sample?

A. Clearly not.

ATC (CAPT BOOMGARDEN): One moment, please, sir.

Q. Have you at any time, Captain Trimper, made a statement to Linda Dale that you were going to the Humana Hospital to have a urine sample taken?

A. No.

Q. Did you at any time in September of 1986, say to Linda Dale that you had received the results back from a urine specimen that you had submitted downtown in Anchorage, and that that sample came back positive for cocaine?

A. Obviously not, no.

Q. So, is it your testimony then that you never submitted a urine sample at the Humana Hospital, and this is an apparent mistake of identity?

A. Well, all I can say, I never submitted a sample. Mistake of identity means like when people mistake faces and things like that. That is either someone else by the name of Glen Trimper or someone who went there and used my name.

Both the laboratory report and Mrs. Dale's testimony about appellant's statement to her relating to that report ultimately found their way into evidence. Additionally, Dr. Rogers, a pathologist at Humana Hospital in Anchorage, Alaska, testified that he could remember only one Air Force officer ever coming to the hospital for a urinalysis; that person was about 6'1" to 6'2" tall, average build, sandy hair, and identified himself as a lawyer named Glen Trimper. Appellant is 6'3" tall, weighs 200 pounds, and has light brown hair. However, Dr. Rogers was unable to say whether the specimen to which the laboratory report related was the one submitted by that officer or whether appellant was that officer.

## II

Both at trial and on appeal the defense has challenged the reception in evidence of the laboratory report of the urinalysis performed at Humana Hospital; Dr. Rogers' testimony relating to the identity of the specimen's contributor; Mrs. Dale's testimony concerning appellant's statements to her about the urinalysis and its results; and, of course, the cross-examination of appellant about the laboratory report and the statements to Mrs. Dale. Appellant insists that reception of this evidence was forbidden by Mil.R.Evid 404(b) and 608(b) and also that its exclusion was necessary

as a sanction for failure of the prosecution to perform its disclosure obligations.

## A

According to Mil.R.Evid. 608(b), a witness "may, ... in the discretion of the military judge," be cross-examined about specific instances of conduct.[2] However, apart from a "conviction of crime as provided in Rule 609," extrinsic evidence may not be received to attack or support the credibility of a witness, *see* Mil.R.Evid. 608(b)—unless that evidence is offered to show "[b]ias, prejudice, or any motive to misrepresent." *See* Mil.R.Evid. 608(c). Presumably this limitation on extrinsic evidence reflects an intent to avoid confusion, distraction, and delay in trials.

■ Mil.R.Evid. 404(b) prohibits evidence of other misconduct "to prove the character of a person in order to show that the person acted in conformity therewith." This prohibition—which we have often applied, *see, e.g., United States v. Hicks,* 24 MJ 3, 7 (CMA), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 55 (1987); *United States v. Owens,* 21 MJ 117, 122 (CMA 1985)—is intended to prevent a factfinder from inferring that an accused must be guilty because he is a "bad person" and has a propensity or disposition to commit crimes like those for which he is being tried.

Under Mil.R.Evid. 608(b) and 404(b), it would appear initially that the cross-examination of Trimper about his private urinalysis might be permitted "in the discretion of the military judge," even though it concerned uncharged misconduct on his part, but that introduction of extrinsic evidence to contradict his denials was improper. However, more thorough analysis leads to a different conclusion.

The starting point for this analysis is *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), where the Supreme Court held that, when a defendant testified on direct examination that he had never had any narcotics in his possession, the Government was free to introduce evidence of prior possession of narcotics, even though this evidence would otherwise have been inadmissible because it was obtained by an unreasonable search and seizure. As the Court pointed out:

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

347 U.S. at 65, 74 S.Ct. at 356, 98 L.Ed. at 507.

In *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court used the same rationale in holding that, although an unwarned statement obtained in violation of the rules prescribed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), could not be received as part of the prosecution's case-in-chief, it could be introduced in rebuttal to impeach the defendant's testimony on direct examination.[3] Then in *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), the Supreme Court slightly extended the principle of *Walder* in ruling that evidence that had been illegally seized and otherwise was inadmissible because of the exclusionary rule could be used to impeach "a defendant's statements made in response to" government "cross-examination reasonably suggested by" his direct testimony. *Id.* at 627, 100 S.Ct. at 1917, 64 L.Ed.2d at 567.

■ The lesson we draw from this line of cases is that even an exclusionary rule which has a constitutional basis cannot be manipulated by a defendant to permit him to commit perjury with impunity. If this

---

2. In exercising his discretion, the military judge should consider the factors mentioned in Mil.R. Evid. 403, Manual for Courts–Martial, United States, 1984.

3. On the other hand, an involuntary statement may not be used even for impeachment. *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

be so, it seems clear that Mil.R.Evid. 608(b) and 404(b) must be applied in the same way. Thus, if a witness makes a broad collateral assertion on direct examination that he has never engaged in a certain type of misconduct or if he volunteers such broad information in responding to appropriately narrow cross-examination, he may be impeached by extrinsic evidence of the misconduct. *Cf. United States v. Clemente*, 640 F.2d 1069 (2d Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); *United States v. Opager*, 589 F.2d 799 (5th Cir. 1979); *United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978); *United States v. Bell*, 506 F.2d 207 (DC Cir. 1974); *United States v. Beno*, 324 F.2d 582 (2d Cir. 1963), *cert. denied*, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1964); *United States v. Banker*, 15 MJ 207, 211–12 (CMA 1983); *United States v. Garcia–Garcia*, 25 MJ 652 (AFCMR 1987), *pet. denied*, 26 MJ 85 (1988); *United States v. Bowling*, 16 MJ 848 (NMCMR 1983).[4]

■ Under Mil.R.Evid. 404(a)(1), an accused's character generally is not in issue at trial. However, he can offer "[e]vidence of a pertinent trait of" character to prove that he "acted in conformity therewith on a particular occasion;"[5] and in that event, the prosecution may "rebut" this evidence. As we interpret Mil.R.Evid. 404(a)(1), an accused who testifies that he has never engaged in conduct like that for which he is being tried is offering evidence that he possesses the "pertinent trait of" abstaining from such conduct. A logical—and permissible—rebuttal by the prosecution is to show that the accused previously has engaged in similar misconduct.

■ Trimper was asked on cross-examination whether he had "use[d] cocaine at any time the night before"—a quite specif-

ic question. He responded, "I have never used cocaine"; and, in so doing, he went far beyond the scope of the question. To show Trimper's lack of credibility, trial counsel was entitled to cross-examine him about his obtaining a private urinalysis and about the outcome of this test. Thereafter, in light of his denials, the prosecution was entitled to offer extrinsic evidence to show that his testimony on this matter was false—from which the courtmembers could reasonably infer that some of his other testimony also was false.

■ Since Trimper's answer that he had never used drugs was "[e]vidence of a pertinent trait of" character—that he was a nonuser of drugs—the Government was entitled to "rebut" this evidence. *See* Mil.R.Evid. 404(a)(1). The extrinsic evidence that Trimper had himself obtained a drug test which proved to be positive clearly rebutted his claim that one of his traits was that he never used drugs; and so it was admissible for this purpose, as well as to impeach his credibility.[6]

The case would be quite different if the testimony about no prior use of drugs had been "extracted from" Trimper by the prosecution or if the prosecution had been seeking to "turn a defense witness into a character witness through cross-examination and, thereby, bootstrap otherwise inadmissible evidence into the case." *Cf. United States v. Maxwell*, 21 MJ 229, 230 (CMA 1986). However, as we read the record, Trimper's denial that he had ever used drugs was gratuitous; and undoubtedly it was volunteered in the belief that it would help persuade the courtmembers that he was an innocent man being victimized by a band of liars.

4. Even when an accused has opened the door with his answer, the judge, after determining that the assertion was volunteered, must still decide whether the probative value of the proffered extrinsic evidence "outweigh[s] ... the danger of unfair prejudice," *see* Mil.R.Evid. 403.

5. We have construed "pertinent trait" broadly. *See, e.g., United States v. Court*, 24 MJ 11 (CMA

1987); *United States v. Weeks*, 20 MJ 22 (CMA 1985).

6. Trimper's obtaining the private urinalysis might also be construed to demonstrate his consciousness of guilt and, therefore, to constitute an admission by conduct. Such an admission would be substantive evidence.

## B

▮ Even though the extrinsic evidence was admissible to impeach Trimper's credibility and to rebut his character evidence, it could not properly be used by the factfinder to infer that, because appellant had used drugs on a later occasion, he was guilty of the charged offenses. Upon request, the defense would have been entitled to a limiting instruction to this effect. However, there was no request that the members be instructed as to the limited purposes for which the challenged evidence was admitted; and, absent such a request, the military judge was not required to advise the members in this regard. Mil.R. Evid. 105.

## C

Appellant contends that the Government had a duty to disclose to the defense before trial that it possessed the report of the urinalysis test results and evidence of Trimper's remarks to Mrs. Dale about the positive urinalysis. As to the report, Trimper relies on RCM 701(a)(2)(B), which requires the Government, "[a]fter service of charges [and] upon" defense request, to "permit the defense to inspect ... [a]ny results or reports of physical or mental examinations, and of scientific tests or experiments ... which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial."

▮ According to the defense view, trial counsel intentionally did not disclose this evidence in its possession, so that the prosecution might lie in wait during the trial and affirmatively and skillfully steer Trimper into his sweeping denials—all in order that it might devastatingly use the concealed information for impeachment and rebuttal purposes. Such trial-by-ambush tactics are discouraged; and where clearly they have been employed, we will recognize them for what they are. *See United States v. Maxwell, supra* at 230. However, the military judge expressly found an absence of prosecutorial "bad faith"; and

the record adequately supports those findings.

▮ Even so, we conclude that the laboratory report should have been disclosed. It concerned a private urinalysis performed on September 4 to detect cocaine and marijuana; and Trimper was being tried for use of both substances over a period of time extending into August. In view of this very short interval of time, we conclude that the positive result of the urinalysis was "material to the preparation of the defense." Even though trial counsel did not intend to use the report in his case-in-chief, he should have recognized its materiality to the defense and disclosed it.

Insofar as the statements to Mrs. Dale are concerned, we have observed that the "unambiguous language [of Mil.R.Evid 304(d)(1)] includes remarks made during informal conversations." *United States v. Callara*, 21 MJ 259, 262 (CMA 1986). Moreover, "[t]his unambiguous language" is not limited to statements made by an accused to law-enforcement officials or military superiors. As with the laboratory report, the prosecutor should have foreseen the likely relevance of this evidence for one purpose or another at trial. "[I]f there is a reasonable prospect that the statement might be offered in evidence during the trial, then disclosure is required." *Id.* at 263. Significantly, trial counsel himself did not dispute that he was obligated to notify appellant of the statement; instead, he simply claimed to have "overlooked the urinalysis statement."

## D

While we agree that the failure to disclose this evidence constituted error, we do not agree with appellant that exclusion of the evidence was necessary to remedy the situation. RCM 701(g)(3) permits the military judge to redress a failure to disclose evidence—such as the laboratory report here—in a variety of ways, including ordering discovery, granting a continuance, excluding the evidence, and "enter[ing] such other order as is just under the circumstances." Mil.R.Evid. 304(d)(2)(B) is equal-

ly flexible as to evidence like appellant's statement to Mrs. Dale. In *United States v. Callara, supra* at 263, we pointed out that this provision "grants authority to the military judge to 'make such orders as are required in the interests of justice'—orders which may include but certainly are not limited to suppression of the pretrial statement as evidence."

Appellant has pleaded with this Court to recognize that a continuance in these circumstances was not "just under the circumstances" and not adequate "in the interests of justice." He argues that a continuance would only have permitted the damaging evidence to lie and fester in the minds of the court members in the interim, growing to an importance even greater than it had initially. While generally we have some sympathy for this position, the same could be said to a greater or lesser degree in any case of erroneous nondisclosure, where a continuance was used as the remedy.

We realize that Trimper would probably have testified in a more restrained manner if he had been aware that the Government had evidence of the positive urinalysis on September 4. Thus, if the military judge had accepted the defense contention that the non-disclosure was part of a cunning prosecutor's scheme to "ambush" appellant when he testified, the grounds for excluding the evidence would be stronger.

■ However, even intentional nondisclosure of discoverable evidence does not inevitably require as a sanction that the evidence be excluded. Indeed, in *Callara*, we expressly concluded that,

> even if the evidence had shown that trial counsel willfully violated Mil.R.Evid. 304(d)(1) in not disclosing the statement prior to appellant's arraignment, ... the judge was still free to determine that it would be "in the interests of justice" to admit the statement when the statement demonstrated that appellant had lied as a witness.

*Id.* at 263. Our statement there prophesied the facts of this case and, as well, fully disposes of appellant's hollow pleas for justice.

### III

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.