UNITED STATES

v.

**Senior Airman Joseph R. FORTNER, FR316–60–7799 United States Air Force.**

**ACM 28446.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 22 Feb. 1990.

Decided 11 March 1992.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Major Ronald G. Morgan.

Appellate Counsel for the United States: Colonel Robert E. Giovagnoni and Captain James C. Sinwell.

Before LEONARD, RIVES and JAMES, Appellate Military Judges.

## OPINION OF THE COURT

LEONARD, Senior Judge:

Contrary to his pleas, appellant was convicted in a bench trial of two offenses of committing carnal knowledge with his 15-year-old niece. His adjudged and approved sentence includes a bad-conduct discharge, confinement for 1 year, forfeiture of $400 pay per month for 12 months, and reduction to E-1. In his appeal to us, he raises five issues. We find merit in one issue and set aside one carnal knowledge conviction.

### I. Sufficiency of the Evidence

We first examine appellant's assertion that the evidence in the record is insufficient to support his convictions. To dispose of this issue, we begin with a discussion of the complicated fact pattern.

### A. Facts

Appellant entered the Air Force in April 1986 and was assigned as an intelligence specialist at Mather Air Force Base, California. Over the next 3 years, his military record reflects outstanding duty performance meriting distinctive recognition on several occasions. At the time of the incidents for which he was convicted, appellant was 26 years old and single.

On 28 April 1989, appellant traveled to Denver, Colorado, on emergency leave to visit his sister-in-law, who was hospitalized with leukemia. During his visit, he stayed with his brother's family at their house. Present were both of his brother's daughters, ages 15 and 17. The younger of the two is the victim in this case. Additionally, the appellant's mother (the victim's grandmother), an adult male cousin B, and other members of appellant's extended family were visiting at the same time.

On the night of 29 April, the victim and cousin B partied together, drank heavily, and engaged in sexual intercourse in the basement of the victim's house. The following day, the victim arose around noon and met appellant in the living room with other family members. Throughout the afternoon, she rested on the couch. Late in the afternoon, the remaining family members left the house to visit appellant's sister-in-law and were gone for about an hour. Feeling ill, the victim stayed behind and continued to rest on the couch. Appellant remained with her.

According to the victim, once the others were gone, appellant began kissing her "romantically." Shortly thereafter, he asked her to accompany him to the basement, where he spread a blanket on the floor, and the two laid down and had sexual relations. According to the victim, appellant then told her not to tell anyone of the incident. In sworn testimony on findings, appellant denied the incident ever occurred, maintaining that the victim remained asleep on the couch during the entire period the others were away.

Later that evening, appellant and cousin B went together to a video rental outlet.

On the way, cousin B confided in appellant out of a sense of guilt about his sexual relations the previous night with the victim. Appellant responded, "What would you say if I told you I did too." After a pause, appellant stated that he was joking. At trial appellant admitted he had made the remark, but said he did so to "lighten up the moment."

According to the victim, on the evening of 1 May (the next day), appellant asked the victim to meet him again in the basement in the middle of the night. She stayed up alone in her room listening to the radio until about 1 a.m. the next morning. She then made her way in the dark through the living room, where other family members were sleeping, to the basement. There she found appellant waiting, and once again the two had sexual relations. According to the victim, appellant again told her not to tell anyone. During his testimony, appellant denied that the second incident ever occurred.

The victim's account of remaining in her room alone listening to the radio conflicts with the testimony of the victim's sister that the two girls were sleeping in the same room that night. Similarly, the victim's version of her descent in darkness through the living room to the basement is contradicted by other witnesses. According to both cousin B and the victim's grandmother, two of the family members she identified as sleeping in the living room that night had already left town. Cousin B also testified that in order for the victim to have passed through the living room, she would had to have stepped over him or climbed over the furniture. He stated further that although he is a light sleeper, he was not disturbed that night.

On 2 May, the victim ran away from home for a week. She first reported her sexual encounters with appellant about a month later to a mental health worker at a psychiatric hospital where she had previously been institutionalized.

Cousin B testified that following his admission of sexual misconduct to appellant, both appellant and appellant's mother repeatedly pressured him not to talk with investigators. When appellant found out that cousin B had confessed to sexual misconduct, appellant told him that he had betrayed appellant. On the morning cousin B was scheduled to testify at trial, appellant inquired whether he intended to testify and stated, "You might as well put the cuffs on me yourself."

The court heard considerable testimony bearing on the victim's credibility. Evidence was admitted that the victim suffered serious substance abuse problems—both of alcohol, and drugs, including marijuana, cocaine, and LSD. Additionally, the victim had a history of delinquency and disciplinary problems at home. As to her reputation for truthfulness, the victim's grandmother testified that it was "no good." The victim's father testified that she would be honest "as to a major issue when finally confronted."

### B. Analysis and Law

Under Article 66(c) of the Uniform Code of Military Justice, 10 U.S.C. § 866(c), this court has the duty to evaluate the evidence to insure it is both legally and factually sufficient to support any conviction. The Court of Military Appeals has clearly defined the standards for reviewing the evidence:

> The test for [legal sufficiency] is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A.1987).

Viewing the evidence in the light most favorable to the prosecution, we determine it to be legally sufficient to support the court's findings on both specifications.

However, exercising our powers of factual review, we come to a different conclusion.

■ We first examine the specification charging the 30 April offense. Though we have concerns about the victim's credibility, we note that the judge viewed her testimony and found her to be believable. Hence, making allowances for having not been present in the courtroom, we find the evidence to be factually sufficient to support the conviction.

■ Examining the evidence of the 1 May offense, we arrive at a contrary conclusion. Our concerns extend beyond witness credibility to the factual consistency of key portions of the victim's story vis-a-vis the testimony of witnesses other than appellant. Her account of what occurred immediately prior to her second sexual encounter with appellant conflicts with the testimony of every other witness—government and defense—who recounted what happened that evening. The cumulative effect of these factual inconsistencies, coupled with our concerns regarding the victim's credibility, cause us to have a reasonable doubt that the appellant committed the charged offense on 1 May.

## II.  Comments of Trial Counsel on Cross–Examination

Appellant contends that the military judge erred in permitting the trial counsel to act as a "human lie detector" during cross-examination of appellant. The assigned error refers to the following discourse:

Q.  Airman Fortner, I don't know how much training you have had in this, but sometimes when people don't tell the truth they do funny things, they fidget or they pull on their ear after they lie or their face gets red when they lie. Are you familiar with that and does that make sense?

A.  Yes, ma'am.

Q.  Do you know what it is that you do when you lie?

A.  I'm not lying.

ADC: Objection, Your Honor.

TC: I asked a simple question.

MJ: I think it's fair cross.  I'm going to overrule the objection.

By Trial Counsel:

Q.  Do you know what it is?

A.  That I do?

Q.  Mm-hmm.

A.  Not in particular, ma'am.

Q.  Would you be surprised to know that everytime you deny sleeping with [the victim], that you blink a lot right afterwards, but that when you talk about things like going to dinner and having spaghetti, you can look anybody in the face and talk about that all day without blinking.  Does that surprise you?

A.  No, ma'am, because I'm not lying.

Q.  It doesn't surprise you then that you blink a lot when you talk about not having sex with [the victim] and that you don't blink when you talk about having dinner in the Italian restaurant?

A.  Should it ma'am?

Q.  Should it surprise you?

A.  It doesn't, because I'm telling the truth.

■ We find the trial counsel's comments to be improper in this case.  Noting the mannerisms of a witness for the record is permissible at the discretion of the military judge.[1]  *Cf. United States v. Miller*, 14 M.J. 924, 925 (A.F.C.M.R.1982) (the failure to record facial gestures or body language does not render a record incomplete).  However, the trial counsel went beyond this, expressing a personal opinion regarding the truthfulness of appellant's testimony.

■ Judging the credibility of evidence remains solely within the province of the

---

1.  We note that after the adverse ruling on the objection, defense counsel used this tactic to his advantage:

ADC:  Your Honor, can we let the record reflect that on those last three answers, Airman Fortner was not blinking.

While ordinarily it would not be proper to record the absence of facial gestures or other body language, it was appropriate under these circumstances.

finder of fact. It is well established that witness testimony expressing an opinion on the truthfulness of another's statement is not admissible at trial. *United States v. Adkins*, 5 U.S.C.M.A. 492, 18 C.M.R. 116 (1955); *United States v. Wagner*, 20 M.J. 758 (A.F.C.M.R.1985). Additionally, the role of the expert witness has been carefully confined to avoid testimony as a "human lie detector." *United States v. Partyka*, 30 M.J. 242 (C.M.A.1990); *United States v. Tolppa*, 25 M.J. 352 (C.M.A.1987); *United States v. Petersen*, 24 M.J. 283 (C.M.A. 1987); *United States v. Cameron*, 21 M.J. 59 (C.M.A.1985).

▮▮▮ In the past, this Court has specifically held that the interpretation of body language is not the proper subject of testimony. *United States v. Clark*, 12 M.J. 978, 979 (A.F.C.M.R.1982). Furthermore, counsel may not argue their personal opinions regarding truthfulness of the testimony of any witness, particularly the accused. *United States v. Knickerbocker*, 25 U.S.C.M.A. 346, 54 C.M.R. 1072, 2 M.J. 128 (1977).[2] It follows that during examination of a witness, counsel may not weave a personal assessment of the witness' body language into the content of the questions. Hence, we find the military judge abused his discretion by overruling the defense objection and permitting this line of questioning. However, we consider any prejudice that may have flowed from this error rectified by our disapproval of one of appellant's convictions.

### III. Improper Rebuttal

Appellant also complains that the military judge erred by permitting trial counsel to introduce improper rebuttal evidence. During cross-examination of appellant's mother, the following dialogue occurred:

Q. Do you remember talking to your son, [the victim's father], Monday night?

A. Mm-hmm.

Q. Do you remember what you told him about this particular offense?

A. I told him that I didn't believe it ever happened and he told me—that he said, to tell you the truth of it, I'm not even sure that it's the truth.

Q. [The victim's father] is trying to stick up for his brother in your eyes, isn't he?

A. I don't know if that's what he was doing. He just said that he couldn't swear to it that she was even telling the truth?

After the defense rested, the government called the victim's father to testify that he had not made the comments at issue. The military judge permitted the testimony over defense objection.

▮▮▮ The government may rebut evidence offered by a defense witness that is non-responsive to an inquiry on cross-examination. *United States v. Trimper*, 28 M.J. 460 (C.M.A.1989). In this case, the trial counsel's line of questioning was proper cross-examination of appellant's mother. Mil.R.Evid. 608(c). In response to a narrow question designed to elicit her comments made during an out-of-court conversation, she gratuitously offered comments made by the other party to the conversation. There is no indication in the record that the trial counsel engineered the question to extract otherwise inadmissible evidence from the witness or to set her up for rebuttal. *See United States v. Maxwell*, 21 M.J. 229 (C.M.A.1986). Hence, the military judge's ruling permitting the government to rebut the evidence by direct testimony was not an abuse of discretion. *Trimper*, 28 M.J. at 467.

We find the remaining assignments of error to be without merit.

### IV. Reassessment of Sentence

On the basis of our review for factual sufficiency, the finding of guilty to the specification alleging the 1 May 1989 carnal knowledge offense is set aside and dis-

---

**2.** Voicing the opinions of counsel in the courtroom also raises ethical considerations. A common tenet of professional ethics codes forbids an attorney from stating at trial a personal opinion regarding the credibility of a witness. American Bar Association Model Rules of Professional Conduct, Rule 3.4(e) (1983); *accord,* Air Force Rules of Professional Responsibility, Rule 3.4(e) (1989).

missed. The findings of guilty to the charge and the remaining carnal knowledge specification are affirmed.

Our modification to the court's findings causes us to reassess the sentence. Relying only on those matters properly before the military judge, we are satisfied that we can determine the sentence the court "would probably have adjudged if the error had not been committed at trial." *United States v. Peoples,* 29 M.J. 426, 427 (C.M.A. 1990); *see United States v. Sales,* 22 M.J. 305 (C.M.A.1986).

Reassessing the sentence, we approve only so much of the sentence as provides for a bad-conduct discharge, confinement for 1 year, and reduction to E–1. Considering the entire record, the reassessed sentence is appropriate. Accordingly, the findings of guilty and the sentence, both as modified, are correct in law and fact and are

AFFIRMED.

Judge RIVES concurs.

Judge JAMES dissents:

I disagree with the majority's assessment of the persuasiveness of the evidence, its treatment of the "human lie detector" cross-examination, and its disposition. I would affirm the findings and the sentence.

This case illustrates the requirement of Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988) that we affirm only such findings and sentence as we find correct in law and *fact.* We are explicitly given authority to "weigh the evidence" and "judge the credibility of witnesses," and we do. *Id.* We three have retried this case, and the majority has voted to acquit appellant on one specification. Thus, we sit today as much as jury as we sit as appellate court. When

we examine the factual sufficiency of the evidence, we engage in a very subjective review. Thus, it does my colleagues no dishonor to say that I disagree, for the matter must be resolved by each of us individually, beyond a reasonable doubt.

I also disagree with the majority's treatment of the cross-examination. Appellant framed the issue cleverly, suggesting that this court-martial had heard the kind of "human lie detector" *testimony* that has been condemned in other cases.[3] In fact, it heard no such testimony. It did hear *questions* by the trial counsel that imbedded that kind of thought, but I view that as perfectly acceptable.

Counsel have wide latitude on cross-examination, and credibility is one of the topics to which cross-examination is explicitly dedicated. Mil.R.Evid. 611(b). This trial counsel used a classic technique of cross-examination that is within that wide latitude and especially apt for explorations of credibility: She tried to put words into the witness's mouth and watched to see whether the witness would permit it.[4] This method sometimes shows the witness to be susceptible to manipulation and therefore less credible. Confronting a witness with the witness's tics might, in an exceptional case, demonstrate the witness's demeanor very convincingly, and counsel are entitled to try that tactic if they wish, at least briefly. When they do so, they must do the only thing they are allowed to do on cross-examination: They ask *questions.* There is the central difference between my view and that of the majority: I say trial counsel asked questions, appellant implies that she testified, and the majority says she commented.

3. I note that the illustrative decisions cited by the majority involve efforts to have one witness testify about the credibility of *another.* Furthermore, they were cases in which either an expert or pseudo-expert was asked to do so. It is hardly likely that the majority intends to imply that it is improper to invite witness X during cross-examination to admit that witness X is unreliable in one respect, many, or all. That is a major objective of many such examinations, though they are the most difficult.

4. It is not relevant to our disposition that the technique does not seem to have worked especially well in this case. Trial counsel tried to use an ax instead of a razor, and the witness seems to have seen it coming. Had trial counsel persisted ineffectively, the military judge could certainly have regulated the waste of energy under Mil.R.Evid. 403; R.C.M. 801(a)(3).

It is often taught, in the lurid shorthand used in forensics courses, that it must always be thus, that an effective lawyer does *all* the testifying on cross-examination and the witness merely subscribes. Such a statement effectively communicates the thought intended, but it does so at the cost of accuracy. We all know that lawyers may not testify during examination; witnesses testify. No witness in this case gave "human lie detector" testimony. Though invited to do so by trial counsel's questions, the witness refused to be duped. That should have been the end of this issue.

The time for comment is argument, but no one has complained about any improper comment during argument. It does not follow from *Clark* that counsel may not comment in argument upon a witness's "body language"; *Clark* only holds that experts and pseudo-experts may not give *testimony* about their "body language" theories of credibility. It would shock the bar to hear that a lawyer may not argue in closing that a witness's behavior during examination suggests dishonesty or less than complete confidence in the answers given. Thus, a "common experience of mankind," or "ways of the world" argument is acceptable, but junk science testimony is not. The crux of the issue is the *Knickerbocker* problem, that counsel may

not express their own views. But trial counsel never stated her own opinion. She just asked questions.

To accuse trial counsel's *questions* of being comment attributes to the listener the inability to discriminate between a question and an assertion. It is sometimes true in the human experience that listeners cannot do so, but this experienced military judge can be fairly trusted to have discriminated between counsel's question and the witness's reply. Had there been any danger that he would have been impaired, one would have expected defense counsel to complain that the questions were argumentative, but there was no such objection.[5]

I am equally unimpressed with the quibble about the propriety of trial counsel's rebuttal of the gratuitous, nonresponsive answer given during cross-examination by trial counsel. *See* Mil.R.Evid. 402, 403, 611(a); R.C.M. 801(a)(3). The whole matter is hardly a fly-speck in the record. The military judge's decisions were within his discretion, and he did not abuse it.

**5.** It should be evident from my approach to this issue that I have found no place at which trial counsel gave her opinion of the credibility of a

witness, and therefore I find no ethical dimension to this case.