UNITED STATES

v.

**Captain Bruce W. STROUP,**
**308–64–2893 FV, United**
**States Air Force**

**ACM 24916.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 14 July 1984.

Decided 2 June 1987.

Appellate Counsel for the Appellant: Eugene R. Fidell, Washington, D.C. 20037. Edward F. Sherman, Austin, Texas 78705.

Colonel Leo L. Sergi, Major William H. Lamb and Captain Henry J. Schweiter.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert, Colonel Andrew J. Adams, Jr., Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni, Major Joseph S. Kistler and Major Kathryn I. Taylor.

Before HODGSON, FORAY and MURDOCK, Appellate Military Judges.

## DECISION

MURDOCK, Judge:

After a long and tumultuous trial, a general court-martial, with officer members, convicted the appellant of conspiring to steal more than one million dollars of United States' funds, stealing seven United States Treasury checks, and uttering, with intent to defraud, a falsely made check in the amount of $945,670. He was sentenced to dismissal, total forfeitures, and confinement for three years.

The charges stem from the appellant's assignment as an accounting and finance officer at RAF Mildenhall, England. One of his duties as the deputy accounting and finance officer in charge of paying and collecting was to sign government checks. To facilitate this duty a die had been made of his signature which could be used to sign checks. Although the machine did not work properly during most of his assignment, the die fit into an automatic check signing machine, and checks could be signed by manually operating the machine. Apparently because the blank checks and the signature dies were stored in his area and because he was an authorized check signer, the original conspirators decided to include the appellant in their scheme to steal government checks and cash them for about one million dollars apiece.

Through a series of misadventures, the scheme began to unravel and the primary thieves were identified. The appellant's involvement came to light during questioning of these thieves. One of the thieves was an Air Force master sergeant who worked in accounting and finance. The other was a former U.S. Air Force airman who had left the service and settled in England.

The appellant has asserted eleven errors. Although we do not find merit in any of them, several deserve special consideration here.

## I.

### Evidence Concerning the Appellant's Father

The appellant asserts that the military judge erred by overruling various defense objections and motions *in limine* protesting the trial counsel's interjection of information concerning the appellant's father into the trial. We find that no error was committed.

Sometime during the appellant's teens, his father moved from the family home in Ohio and resettled in the Cayman Islands where he became an investment counsellor. At about the same time that the appellant's court-martial was nearing trial, the father was arrested and placed in pretrial confinement at a federal prison in Florida.

The appellant testified in his own defense. During an Article 39(a), U.C.M.J., session the trial counsel asked several questions about the extent of the appellant's knowledge about his father's situation. In particular, he asked if the appellant had ever said that his father was a crook or ever said that his father was engaged in illegal activities. Later he asked the appellant when he had learned about his father being in jail. The appellant's responses varied from an initial statement that he had just heard about it, to an eventual admission that he had known his father was in jail almost from the time he entered the jail.

From this point the trial counsel launched into extensive questioning of the appellant and other witnesses about the appellant's father. He tried to establish that the appellant had described his father as a "crook", and that the father was deeply involved in shady financial dealings.

It is apparent to us that the trial counsel was delighted that the appellant had a father with personal business activities that could be made the object of innuendo so easily. Many people are inherently suspicious of the mysterious activities of the wealthy and their advisors. When these activities involve an American expatriate dealing from an exotic Caribbean island it is tempting to assume that something illegal is taking place. Many prosecutors would love to be able to associate a person who is charged with money crimes with the shadowy activities of international finance. Although the trial counsel tried diligently to find some connection between the appellant's father and the theft involved in this case, he was not able to do it.

Because the government did not prove a connection existed between his father and the charged crime, the appellant now complains that all mention of his father was irrelevant and objectionable. He might be correct if he had been forthright with his testimony, or had refused to testify at all. If his responses had all been consistent there would have been no point in pursuing the inquiry about the father's status. As it was, the overall tenor of the appellant's testimony was wary, sparring, and argumentative. Statements which began as flat denials often became partial admissions under cross-examination. This turned a simple area of inquiry into a very fertile ground for testing the appellant's credibility.

■ When an accused chooses to testify he becomes a sworn witness. As such, his credibility is at issue. Mil.R.Evid. 608(a) and (b). This is particularly important in a case such as this where there is no direct evidence of the appellant's involvement other than the statements of other participants. In our view, because of the appellant's shifting answers about his knowledge of his father's activities, it was proper to question him further to evaluate his credibility. The military judge did not err by overruling objections to it.

## II.
### Admissibility of Statements

In several related assertions of error, the appellant complains that statements made by one of the primary thieves were erroneously admitted. These errors concern two categories of statements.

The first category concerns testimony of a staff sergeant from the finance office in which he related conversations he had with the primary thief. This sergeant found himself between the interests of the Office of Special Investigations (AFOSI) and the primary thief. The AFOSI wanted him to serve as a source of information about the theft but he refused. Instead, he continued to meet with the primary thief and pass information along about the status of the investigation.

■ To be considered statements of a co-conspirator, statements must have been made during the course of and in furtherance of a conspiracy. Mil.R.Evid. 801(d)(2)(E). The conspiracy in this case was to steal government checks, negotiate them, and share the proceeds. The statements made to the sergeant were all made before the object of the conspiracy was complete. Most of the checks had not yet been negotiated. In fact, a number of the thief's discussions with the sergeant were about why the initial check had been detected and how future checks should be completed to avoid detection. The thief asked the sergeant to go to Greece and talk with the appellant. Because he considered that the point of the trip to Greece would be to blackmail the appellant, the sergeant refused. The thief also asked the sergeant whether he could get him a current signature die and another government check. The nature of these conversations convinces us that the conspiracy was still active and the statements were made in furtherance of it. The thief's statements, related by the sergeant, were properly admitted as statements of a co-conspirator. Mil.R.Evid. 801(d)(2)(E).

■ The other category of statement refers to the contents of a tape recording of a

conversation between one of the primary thieves (the same thief as was involved in the other category) and a third party. The conversation recorded on this tape, while referring to the theft, does not appear to be in furtherance of the conspiracy. The comments are more a narration of what had happened to that point than active plotting. For example, the thief tells the listener that "the captain has been nicked", probably referring to the appellant's questioning by AFOSI. Because they were not in furtherance of a conspiracy, the comments are not the statements of a co-conspirator. Their admissibility must be decided as a statement against interest under Mil.R.Evid. 804(b)(3).

When British authorities arrested the thief they found the tape in the car in which he was riding. The car had previously been owned by the thief and the present owner worked for the thief. The defense alleges that the tape was not properly authenticated. We disagree. The voices were identified by the British police inspector most involved with the case, both the appellant's name and a nickname of the thief are mentioned on the tape, and the tape was found in a place where it would not be surprising to find property belonging to the thief. Additionally, the defense stipulated to the circumstances under which the tape was found. The statements clearly tend to subject the declarant to civil or criminal liability.

The declarant must be unavailable for statements against interest to be admissible. Mil.R.Evid. 804(b)(3). In the next portion of this opinion we hold that the military judge was correct in finding that the declarant was unavailable. The statements were admissible and the military judge did not err in admitting them.

### III.

### Privilege Against Self-Incrimination

The appellant asserts that the military judge erred by admitting statements of one of the primary thieves because he was not "unavailable" and he did not properly invoke the privilege against self-incrimination.

The thief was a former U.S. Air Force airman who settled in England. This witness claimed he had dual citizenship, United States and British. He could therefore be prosecuted for appropriate offenses in civilian courts in both the United States and Britain. This is an unusual situation and one which differs from prior cases which have held that a court-martial cannot honor a foreign citizen's assertion of a foreign country's privilege against self incrimination. *United States v. Murphy*, 7 U.S. C.M.A. 32, 21 C.M.R. 158 (1956).

In the present case the prospect of prosecution in British courts was very real. In fact the witness was in pretrial confinement awaiting trial at the time of the court-martial. Because the offenses took place on an American base, and involved theft of United States government property, there was also a real possibility that the United States might prosecute.

At the time of the court-martial the witness was preparing for his own trial and was being advised by a British solicitor. It is, therefore, not surprising that when the witness wished to invoke his privilege, he used words more appropriate to the British system than to ours. After reading an initial statement to the court, the witness refused to be questioned or to make any further statement. He claimed his action was on advice of counsel and he and his solicitor explained that the refusal was based on the British "caution" which is a warning similar to American "Miranda" warnings.

There ensued a protracted battle over whether the witness was properly invoking a privilege which could be recognized in an American court-martial. Essentially, in many different words, the witness said he would not answer questions—that he claimed his "right to silence". The trial counsel continued to hammer at him to try to get "American-style" privilege words out of him. After repeated tries it was decided to allow the witness to confer with his solicitor and return to court in two

days. When he returned he once again asserted his "British-style" right to silence. More extensive questioning followed until the witness finally said he was asserting the right to silence "on the grounds it may incriminate me because I have not been given any other right". He explained that the last part meant that he had not been given any other option as a way to answer the questions and still protect himself from prosecution.

This unseemly exercise was unnecessary. It was plain from the beginning that the witness was refusing to testify and that his refusal was based on the same grounds that justify assertion of a Fifth Amendment privilege. Nothing was gained by agonizing over the question for parts of three days. The witness properly invoked his privilege against self-incrimination, and the military judge was correct in finding him unavailable.

### IV.

#### Other Matters

We cannot end our opinion on this case without commenting on the incredible bulk of the record, and the length of time it took to try the case. The record of trial in this case is more than 6000 pages long. The actual trial transcript is 3197 pages long. The trial began on 6 June and did not end until 14 July.

We recognize that it is easy to criticize from a distance and that the real dynamics of a trial are never felt outside the courtroom. However, we feel compelled to remind trial participants of the trial judge's responsibilities under R.C.M. 801 which are similar to those in effect at the time of this court-martial. MCM, 1969 (Rev.), para. 39 b. R.C.M. 801 charges the trial judge with "ensuring that court-martial proceedings are conducted in a fair and orderly manner, without unnecessary delay or waste of time or resources". That includes ending discussions which go beyond their usefulness.

There were many opportunities in this case for exercising restraint. For example, the trial counsel and civilian defense coun-

sel argued, on the record in an Article 39(a), U.C.M.J. session, over how long closing arguments on the merits should be. The discussion stretched over nearly ten legal sized pages. The length of argument is clearly within the discretion of the judge. After hearing inputs from the sides, he should have ruled.

We do not intend to indicate that the judge did not work hard at keeping the trial on track. The impression from the record is that the judge constantly attempted to corral the attorneys and keep the discussions limited and appropriate. It appears that he had little assistance from the trial attorneys. In particular, the trial counsel appeared unrestrained in his use of the court's time and patience. He was not satisfied merely to make his point. Rather, he wanted to make the point only in terms of his own choosing. Sometimes this is essential, but it is often the result of a lack of clarity or focus on the part of the advocate. Judges and advocates need to be alert and disciplined enough to be efficient in the courtroom.

### V.

We have read the entire record, the allegations of error submitted by the appellant, and the government's reply thereto, and heard oral argument in this case. We are convinced that no error materially prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

Chief Judge HODGSON and Senior Judge FORAY concur.