UNITED STATES, Appellee,

v.

Bruce W. STROUP, Captain, U.S. Air
Force, Appellant.

No. 58,539.
ACM 24916.

U.S. Court of Military Appeals.

Sept. 29, 1989.

For Appellant: *Edward F. Sherman, Esq.* (argued); *Eugene R. Fidell, Esq., Colonel Leo L. Sergi, Colonel Richard F. O'Hair, Captain Henry J. Schweiter, Captain Mark R. Land* (on brief).

For Appellee: *Major Kathryn I. Taylor* (argued); *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni* (on brief).

## Opinion of the Court

COX, Judge:

In June and July of 1984, a general court-martial with members, sitting at Royal Air Force (RAF) Mildenhall, United Kingdom, convicted appellant, contrary to his pleas, of conspiring to steal in excess of $1,000,000; larceny of United States Treasury checks; and uttering a check falsely made in the amount of $945,670, in violation of Articles 81, 121, and 123, Uniform Code of Military Justice, 10 USC §§ 881, 921, and 923, respectively. He was sentenced to dismissal, confinement for 3 years, and total forfeitures. Except for a brief deferral of confinement, the convening authority approved the sentence. The Court of Military Review affirmed. 24 MJ 760 (1987).

We granted review of seven issues. As we hold in favor of appellant on the first three issues, it is unnecessary for us to reach those remaining.[1]

To better understand the issues, it will be helpful to know the manner in which the offenses underlying the charges came to light. On May 19, 1982, a man identifying himself as "Mark McCleod" established a corporation on the Isle of Man called Venue Enterprises Limited. The corporation opened an account with the Investment Bank of Ireland and deposited into it a U.S. Treasury check in the amount of $945,670, payable to the corporation.

A few days later, on May 24, U.S. finance officials at RAF Lakenheath, the alleged source of the check, were contacted by the bank to verify the check. It was immediately recognized that the check was a forgery because the serial number of the check was way out of sequence. That check would not have been issued for many months. Subsequent inventories established that some 40 checks were missing from their sealed storage containers.

When "McCleod" returned to the bank on June 1 and attempted to withdraw over $300,000 worth of U.S. and British currency, he was arrested. He turned out to be Martin J. Edwards. The U.S. Treasury check that had been deposited bore the fingerprint of Phillip Law. Law was retired from the U.S. Air Force, lived in England, and was in business there. Before his retirement from the Air Force, he worked at the RAF Lakenheath finance office where the Treasury check should have been stored. Law exercised his rights against self-incrimination under British and American law and refused to testify in appellant's trial. *See* granted issue IV, set out in n. 1, *supra.*

1. The issues we do not decide are as follows:

IV

WHETHER THE ADMISSION INTO EVIDENCE OF HEARSAY STATEMENTS OF LAW MADE TO SSGT TURKE AND TO SPEARING, WHEN LAW WAS NOT ENTITLED TO INVOKE THE PRIVILEGE AGAINST SELF–INCRIMINATION AND WAS NOT "UNAVAILABLE" TO TESTIFY, DENIED THE ACCUSED THE RIGHT TO CONFRONTATION AND TO HAVE A MATERIAL WITNESS MADE AVAILABLE.

V

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY DENYING A DEFENSE REQUEST TO ADMIT TWO TAPES MADE BY LAW, WHERE THE PURPOSE WAS TO SHOW LAW'S MOTIVE AND METHOD IN MAKING TAPES AND THUS TO SHED LIGHT ON THE CREDIBILITY OF STATEMENTS MADE BY HIM ON OTHER TAPES ADMITTED INTO EVIDENCE UNDER HEARSAY EXCEPTIONS.

VI

WHETHER THE ACCUSED WAS DENIED THE RIGHT TO A SPEEDY TRIAL AS GUARANTEED BY ARTICLE 10, UCMJ, 10 USC § 810 AND THE FIFTH AND SIXTH AMENDMENTS.

VIII

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY REFUSING TO GIVE A DEFENSE–REQUESTED ALIBI INSTRUCTION.

As soon as it was determined that the check was false and that others were missing, authorities from both the United States and Great Britain began investigating the case. All persons having recent connections with the finance office were interviewed. At the time of the discovery, appellant was stationed in Greece. However, he had been assigned to the RAF Lakenheath office between late October 1981 and April 1982. He was interviewed by agents of the Office of Special Investigations (OSI) on May 27, 1982, and he submitted to a series of polygraph examinations. In the opinion of OSI experts, these polygraphs indicated deception. Nonetheless, appellant admitted no guilt, and there was no hard evidence pointing to him. With respect to appellant at least, the investigation had reached an apparent dead end.

Another person assigned to the finance office was Master Sergeant Harold W. Walls. Initially, MSgt Walls denied any knowledge or involvement in the instant offenses. By June 1982, however, he was already under investigation by U.S. Secret Service agents for his role in passing or attempting to pass approximately $80,000 in counterfeit U.S. currency. With respect to that offense, he exercised his right to counsel and volunteered no information to the Secret Service. By April 1983, Walls' military counsel commenced negotiations with the Government. The offer was that Walls could implicate a captain in the RAF Lakenheath check offense, and Walls would cooperate in the prosecution. In exchange for this, Walls was to get complete immunity for his role in the check scheme and a Secret Service recommendation for a suspended sentence in the counterfeiting scheme.

In September 1983, the deal between Walls and the Government was struck. Walls related to the authorities that he and Law had for some time been trying to devise a scheme to acquire blank government checks for the purpose of forging and negotiating them. In due course, according to Walls, they approached appellant. He was needed because he had access to the blank checks and the signature dies— the stamps used to print the appropriate official's signature on the checks. According to Walls, appellant's only role was to lend his keys to Walls and Law. They then were to enter the office after hours, and steal and stamp the checks. Law was to be in charge of negotiating the checks; each of the participants was to receive $1,000,-000. Allegedly, appellant agreed and turned over the keys in early October 1981.[2]

Walls testified substantially to the same effect in appellant's court-martial. He added that, during the discussions between himself, Law, and appellant, the latter suggested that the checks be processed through the Cayman Islands. According to Walls, appellant

> seemed very interested in getting the money into the Cayman Islands. He had some contacts in the Cayman Islands or—I was told his father lives in the Cayman Islands.

By the time of appellant's trial, Walls had already pleaded guilty in United States District Court for his role in the counterfeit currency scheme, and he had already received a suspended sentence pursuant to Secret Service recommendation. Other than the circumstance that for sometime appellant had access to the signature dies and the missing checks, Walls' testimony is the only significant, affirmative evidence against appellant.

 The first granted issue we take up is issue II. It asks: WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY ADMITTING OVER DE-

**2.** During one of several Article 32, Uniform Code of Military Justice, 10 USC § 832, investigations conducted in this case, the investigating officer discovered, by reviewing appellant's personnel records, that at the time Walls claimed appellant was participating in the conspiracy, appellant was out of the country attending military training, and he had not yet become custodian of the checks and dies. Confronted with this discrepancy, Walls ultimately adjusted the dates to a period in which appellant was in country and had access to the items.

FENSE OBJECTION THE TESTIMONY OF SSGT TURKE AS TO STATEMENTS MADE BY PHILLIP LAW TO SSGT TURKE UNDER THE THEORY THAT THEY SATISFIED THE REQUIREMENTS FOR "STATEMENTS OF A CO–CONSPIRATOR" OR "STATEMENTS AGAINST INTEREST."

Staff Sergeant Turke testified as a prosecution witness that he also worked in the finance office at RAF Lakenheath, but he had no initial involvement with the theft of checks. Over a period of several months, commencing approximately a year after Walls claimed the theft occurred and several months after the thwarted withdrawal attempt, SSgt Turke had a series of conversations with Law about the incident. In the course of these conversations, Law allegedly admitted his own involvement in the scheme to Turke, along with that of Walls and appellant. Law wanted Turke to go to Greece to try to collect $30,000 from appellant, allegedly to pay for the expenses of the fiasco. Turke took it as a solicitation for blackmail and refused. Law also pressed Turke to help him get another blank check and for information as to how he could negotiate the checks still in his possession.

All of these assertions were admitted by the judge as statements of a co-conspirator made during the course of and in furtherance of a conspiracy. Mil.R.Evid. 801(d)(2)(E), Manual for Courts–Martial, United States, 1969 (Revised edition). That rule provides:

A statement is not hearsay if:

\* \* \* \* \* \*

The statement is offered against a party and is … a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

As a fall-back position, the Government here argues that they were statements against interest and admissible as exceptions to the hearsay rule

under Mil.R.Evid. 804(b)(3). That rule provides: The following are not excluded by the hearsay rule if the declarant is unavailable as a witness[:]

\* \* \* \* \* \*

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the position of the declarant would not have made the statement unless the person believed it to be true.

We hold that neither rule justified admission of Law's out-of-court statements.

Appellant's sole role in the entire transaction, according to Walls, was to loan the keys. Law did not make these supposedly conspiratorial statements to Turke until a year later, after the gambit had long since been discovered. Within hours after the bank first contacted the finance office, *all* the serial numbers were identified; *all* the checks were compromised. By the time these statements were made, appellant had been transferred out of country; and he had been strenuously interrogated by the OSI and accused of being deceptive in denying involvement in the crime. The original conspiracy, if any, was long over.

Further, any attempt to negotiate the compromised checks was so certain to be detected that Law's sincerity must be doubted. Plainly his effort, if genuine, to get Turke to obtain another check had nothing to do with appellant. Moreover, Law's personal admissions of guilt and his implication of appellant did not advance any conspiratorial aims. Even the supposed request for Turke to shake appellant down does not appear to have anything to do with advancing the conspiracy. At best, it was an attempt to get appellant to reimburse costs after-the-fact. At worst it was, as Turke took it, solicitation to blackmail. Whatever Law was up to by September 1982, he was on his own.

Moreover, unbeknownst to Turke, part of these conversations were tape-recorded by Law. It was the discovery of this tape in Law's home by British authorities that led

them to Turke and his testimony. The discovery of the tape also led to Turke's conviction for being an accessory after-the-fact to the theft and for violating an order not to discuss the investigation with Law. At the time Law was making the tape, and he evidently knew of the order. This was not the only tape in this trial that was attributable to Law and was apparently recorded without the knowledge of the other party.[3] This pattern suggests the very strong possibility that Law was in the practice of tape-recording conversations *in order to capture incriminating statements by the other parties to the conversation,* thus giving him leverage over those parties. Any gratuitous references to third parties, under those circumstances, would be highly suspect.

In addition to failing to qualify under the co-conspirators' exception, this tape and Law's statements to Turke were not shown on this record to have possessed that reliability necessary to make them admissible against appellant as exceptions to the hearsay rule and the preference for confrontation, however wonderfully they might have served as admissions against Law in his trial. *E.g., United States v. Koistinen,* 27 MJ 279 (CMA 1988); *United States v. Guaglione,* 27 MJ 268 (CMA 1988); *United States v. Yeauger,* 27 MJ 199 (CMA 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989); *United States v. Hines,* 23 MJ 125 (CMA 1986).

■ Issue III concerns another tape-recording apparently made by Law without the knowledge of the other party to the conversation. The issue is framed as:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY ADMITTING OVER DEFENSE OBJECTION A TAPE OF A CONVERSATION THOUGHT TO BE BETWEEN LAW AND SPEARING.

The tape was found in the automobile in which Law was riding when he was arrested by British authorities in May 1983. The car had previously been owned by Law and was, at that time, owned by a person named Wynn, who was also arrested at that time for offenses unrelated to appellant. Wynn was an employee of Law. The tape was admitted in evidence by the military judge, over defense objection, as a statement against interest (Mil.R.Evid. 804(b)(3)), and it was played to the members. A written transcript was also provided to them.

The parties to the tape were identified by British police as Law and Terrence Spearing. The gist of the conversation was that Spearing was trying to collect on a debt Law owed him. Law was explaining why he was unable to pay. The conversation proceeded as follows:

> Spearing: Philly, shut the door a minute, shut your door. Now I see someone else coming.
>
> Law: He's nicked.
>
> Spearing: Who's this?
>
> Law: The Captain. They cut it down to four people. His name is Stroup. I tell you straight out. (pause) He's gonna talk because he can't take it. We figure, I figure, Terry, you've always got that one chance in a million as you said, um, the reason why the money is tight is as simple as this, I've put everything in a trust in my son's name the business has gone into a company in my son's name.

Later in the tape, Law says: "By the way the name on that guy is Stroup if it helps you at all. They grabbed him in Greece."

Those are the only references in the tape to appellant or having anything to do with appellant or the transactions at bar. The rest of the transcript—10 pages—is filled with obscenities, references to other deals and transactions of dubious origin, and Law's efforts to put Spearing off. According to trial counsel, these remarks were probative of appellant's guilt in that Law was so concerned about appellant spilling the beans and pulling him under that he

---

**3.** *See also* granted issue V, at n. 1, *supra.*

had taken extreme measures to divest himself of his property. The exact date and the location of the recording and other underlying circumstances of the conversation were not established.

Contrary to counsel's contention, however, the tape has no legitimate probative value in this case. First, there is no corroboration that Law undertook any of the maneuvers mentioned. The most obvious inference from the conversation is that Law was saying whatever he had to say to avoid paying Spearing, or at least to explain late payment. Textual analysis apart (the reference to appellant by name later in the tape is a total *non sequitur* and seems to have been made solely for purposes of the tape—*see* discussion of issue II, *supra*), there is nothing in this transcript or elsewhere that establishes reliability, satisfies confrontational values, or adequately compensates for the lack of cross-examination. *See United States v. Koistinen; United States v. Guaglione; United States v. Yeauger; United States v. Hines*, all *supra*. It was error for this hearsay to have been admitted.

■ The final issue we deal with, issue I, concerns a trial within a trial. The issue questions:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY OVERRULING VARIOUS DEFENSE OBJECTIONS AND MOTIONS IN LIMINE PROTESTING TRIAL COUNSEL'S INTERJECTION OF IRRELEVANT MATTER CONCERNING THE ACCUSED'S FATHER INTO THE TRIAL.

To understand the issue, more background is needed.

As a motion *in limine*, appellant argued that his right to a speedy trial was violated. His thesis essentially was that, on that day in May 1982, when the OSI agents interrogated him, such restraint was imposed on him that the speedy-trial clock began to run. To illustrate prejudice, appellant cited

the fact that he did not learn of Walls' claims until some 2 years after the alleged loaning of the key. This lengthy delay made it extremely difficult for appellant to reconstruct events and his whereabouts at the times Walls accused him of assisting the conspiracy.[4] Thus, he was hindered in his ability to establish an alibi.

In addition, appellant attempted to demonstrate prejudice in that, during the lengthy interim between the time he first came under scrutiny and trial, his military career was adversely affected, and many of his social and professional friends became estranged. In support of his motion, appellant testified to these effects on direct examination.

Of critical significance to this case—though one could not have imagined it—was appellant's testimony that, on the day the agents interrogated him in Greece, he tried, unsuccessfully, to call his father in the Cayman Islands. The purpose of the call was to discuss the advisability of obtaining counsel. This testimony occurred on direct examination in support of the motion, during appellant's recital of the events of that day. In the midst of a lengthy and redundant cross-examination, trial counsel returned to the subject of the phone call. After a few innocuous lead-ins regarding when and why appellant tried to call his father, trial counsel popped out with this startling question: "Is your father a crook?" Defense counsel immediately objected on all conceivable grounds.

Trial counsel explained his theory of relevance to speedy trial as this: At the time of the interrogation of appellant, the Government suspected appellant's father may have been involved in the case. (Evidently, this suspicion was based on the fact that a number of witnesses interviewed at RAF Lakenheath recalled appellant boasting or commenting to the effect that his father was some sort of businessman or investment advisor in the Cayman Islands and

---

**4.** Not to mention Walls' facile change of dates after an ironclad alibi was established for the

first time frame identified. *See* n. 2, *supra.*

was *persona non grata* in the United States due to certain tax evasive or otherwise illegal aspects of his activities under U.S. law.) Therefore, in trial counsel's view, the fact that the investigators permitted appellant to try to call his father was an indication that appellant's freedom was not being so limited as to trigger the speedy-trial rule. Had appellant been so restrained, the argument went, the investigators would never have permitted the call, as to do so was tantamount to tipping off the other conspirators. Thus, asking appellant if his father was a crook was offered as probative of lack of restraint!

This inventive claim might have been humorous had the judge not bought it. Whether appellant's father was a crook, or whether appellant so believed, or even whether the police so believed, had nothing to do with whether restraint was imposed upon him in Greece. Certainly, nothing in this record supports the shocking implication that U.S. law-enforcement agents who suspect U.S. servicemembers of committing offenses have the authority to preclude them from contacting their parents. Whatever the law-enforcement officers may have thought about appellant's father, they had no basis to prevent appellant from trying to contact him. Thus, the fact that they let him try was no evidence of lack of restraint. Nevertheless, with the exception of the word, "crook," the military judge permitted the line of questioning as being relevant to restraint.

In rephrasing the question, however, trial counsel completely changed gears. This time he asked whether appellant had ever *told* anyone that his father was "involved in investment schemes, tax evasions, other activities of an illegal nature." Defense counsel again objected on the ground that whether appellant had made such statements was irrelevant to whether his liberty was sufficiently restrained to commence speedy-trial accountability.

Trial counsel's response to this objection indicated that now the questions had nothing to do with speedy trial. Indeed, it was becoming clear that he was determined to get this information to the members *any way he could.* The explanation given was nothing short of amazing. It was that, since appellant was on the witness stand, his credibility was in issue. This, in trial counsel's view, permitted him to ask appellant *anything at all* that in some remote way could be linked to credibility. To this end, trial counsel explained that he anticipated appellant would deny making such statements. Trial counsel, however, could produce witnesses who would testify that appellant used to say those very things. Therefore, trial counsel would be in a position to attack appellant's credibility *on the merits* with this conflicting testimony. Thus, questioning appellant about what he might have said to others about his father went to appellant's credibility.[5] Again, the military judge bit, overruled the objection, and permitted the line of questions. Appellant denied making statements to others about his father being involved in questionable activities.

This goes to show how dangerous a little bit of knowledge can be. Mil.R.Evid. 104 provides:

> (d) *Testimony by accused.* The accused does not, by testifying upon a preliminary matter, become subject to cross-examination as to other issues in the case.

> (e) *Weight and credibility.* This rule does not limit the right of a party to introduce before the members evidence relevant to weight or credibility.

In testifying on the speedy-trial motion, appellant described the conditions on the day of his interrogation in Greece that led him to believe restraint had been imposed. He also testified that the delay prejudiced his ability to prepare his case and that his professional and social life suffered. He

---

**5.** Using similar logic, trial counsel reasoned that, since he had appellant on the stand on a speedy-trial motion, he could ask him anything at all about his activities with Law and Walls regarding the *merits* of the case. For reasons not at all clear, the military judge permitted this dress rehearsal of the trial to a remarkable extent.

did not testify about his father's alleged criminal activities, and he did not volunteer whether he was in the habit of making statements about his father's activities. Whether appellant's father was a "crook" or whether appellant ever said so did not go to appellant's credibility; did not rebut anything stated on direct examination; and was most certainly not relevant to speedy trial. Trial counsel should never have been permitted to wander off on this fishing trip during the motion hearing.

In his case-in-chief, trial counsel promptly produced five witnesses who testified essentially that appellant had said his father was involved in tax-evasion schemes and could not come into some or all of the states for fear of arrest. One witness remembered appellant saying his father was involved in the Watergate incident.[6] This testimony, trial counsel argued, was also corroborative of MSgt Walls' testimony that appellant had urged processing the money through the Cayman Islands. If so, however, the weight was surely minimal. Since many people in the finance office seemed to know about the father's situation generally and since MSgt Walls also worked in the finance office, it would not be surprising for Walls to know something

of the father's circumstances, too. Thus, if Walls' were falsely accusing appellant of involvement, the Cayman Islands detail could readily have been manufactured. The fact that others heard appellant mention his father's business did little to bolster Walls' testimony.

Later in the trial when the witnesses were recalled, several of them admitted being unsure if appellant was joking at the time he made the statements or whether he may have been referring to legitimate, tax-avoidance investments, as opposed to illegitimate, tax-evasion techniques.

During cross-examination of appellant, trial counsel launched immediately into his principal theme—that appellant was a liar. According to trial counsel, virtually everything appellant said was a lie, including all the minute details of his pretrial testimony on the speedy-trial motion. Appellant was also lying in his statement that he would not lie under oath; he was lying when he denied committing the offenses; therefore, he must have committed the offenses. Indeed, trial counsel's very first question on cross-examination was: "Captain Stroup, you've just been sittin' here lying through your teeth about all this, haven't you?"[7]

---

6. Evidently, at one time, appellant's father worked for a corporation that had an office in the Watergate Building. There is no suggestion that he or his corporation was in any way connected with the Watergate incident.

7. Among the duties of a military judge are to "avoid needless consumption of time, and ... protect witnesses from harassment or undue embarrassment." Mil.R.Evid. 611(a), Manual for Courts–Martial, United States, 1969 (Revised edition). In both of these respects, the military judge failed miserably.

The Court of Military Review's observation that, [i]n particular, the trial counsel appeared unrestrained in his use of the court's time and patience. He was not satisfied merely to make his point. Rather, he wanted to make the point only in terms of his own choosing[,] is an understatement in the extreme. 24 MJ 760, 765 (AFCMR 1987).

Further, trial counsel's abuse of appellant as a witness is quite beyond belief. Cross-examination often consisted of nothing but pages upon pages of accusations. Generally, they were not questions at all, but rather trial counsel's thinly disguised testimony of his personal opinion of

appellant. Truly, it was trial by smear and innuendo.

Consider also the following "questions" by trial counsel:

Q. You didn't go find out what happened to your daddy—didn't call him up and ask him—didn't call your momma—didn't do anything else to see what happened to your daddy—right—to try to straighten all this out?

A. I didn't think it was that important.

Q. Ooh! The reason you didn't do those things was because you've known all along and you're just sitting here lying about it—right?

A. No, sir.

* * * * * *

Q. Well, one of the big pieces of information—one of the things he chose to stand here and ask you about and to talk about in the courtroom was what happened to daddy. We went through a whole business—a whole lot of, "Who shot John?", about how daddy got started and when daddy was in the Air Force and when daddy went to work selling insurance and how daddy left town and why daddy was in the Caymans—we did all that, didn't we?

A. That's right.

Q. But you just didn't think it was important.

Trial counsel then reverted to the accusation that appellant was lying when he denied ever telling anybody his "father was a crook"—using the very terminology the military judge had supposedly precluded. Trial counsel also confronted appellant with the prereceived impeachment testimony of those who had indicated he had made such statements. Throughout, appellant denied that his father was a crook or was involved in any illegal activities insofar as he was aware, and he either denied or did not remember making statements to that effect. Trial counsel then proceeded to a lengthy examination of appellant's knowledge of his father's legal difficulties *at the time of trial*, again under the guise that it reflected on appellant's candor in denying that his father was a crook.

The point of all this was that, at the time of appellant's trial, his father had been indicted by a Federal grand jury. He was incarcerated and pending trial in Miami, Florida, for, *inter alia*, solicitation of murder. These facts were well known to trial counsel, and it was this information that trial counsel so gleefully and repeatedly conveyed to the court members—ostensibly so they would know what a liar appellant was in denying his father was a crook. At the same time, as trial counsel readily conceded at trial, there was absolutely no evidence that appellant's father had anything to do with the charges at bar, and there was certainly no suggestion that appellant was in any way connected with his father's predicament. Whether appellant had anything to do with loaning keys to Walls and Law several years earlier had long ceased to be a significant issue in the case.

It is the misuse of this information that turned this court-martial into a perversion of justice. The evidence that appellant had made certain provocative comments about his father may well have explained the initial law-enforcement interest in appellant. However, since those early suspicions did not pan out, it was unconscionable for the prosecution to continue to exploit the father's circumstances for the obvious purpose of prejudicing appellant. As indicated, trial counsel never should have been permitted the initial, irrelevant incursion into whether appellant believed his father was a crook or had ever said anything to that effect, so as to set up the so-called impeachment.

Ironically, the evidence might have been usable in a limited fashion. First, MSgt Walls could have explained his version of the events, along with the point about appellant's wanting to run the money through the Cayman Islands on account of his father. Then, arguably, the five witnesses might have served to corroborate Walls to some degree. In addition, appellant, his wife, and his father (testifying through a videotape deposition), all indicated that, at Law's behest, appellant tried to put Law in contact with appellant's father, as Law was interested in discussing various unspecified business/investment opportunities. Supposedly, nothing developed of the attempt. Of course, the factfinders would have been free to draw their own conclusions about the significance of that. If necessary, additional information might also have been adduced to establish the father's position in the Cayman Islands. However, because there was no contention that appellant's father was ever involved in the offense and because appellant should not have been questioned about his father's alleged general criminality or any statements he might have made in that regard, this is as far as the prosecution should have been permitted to go in its case-in-chief.

A. Well, I had all those answers already.

Q. Well, and so you didn't pick up a 'phone and call daddy and say, "Daddy, all of a sudden everybody's hollerin' about whether or not you're a crook. Tell me what happened." You didn't do that?

A. No, I didn't.

Q. You didn't pick up a 'phone and call momma and say, "Momma, you know I'm in trouble down here and now they're all hollerin' about what happened to daddy. What did happen to daddy?" You didn't do that either did you? This mocking of the parents of a servicemember by referring to them as "daddy" and "momma" is outrageous and should not have been tolerated. It is especially egregious that this conduct was permitted to occur *before the members,* as well as before the judge alone!

Assuming appellant took the stand in his defense, trial counsel might have asked appellant if he had made such statements, and assuming appellant denied it, trial counsel could have made such headway as he might from the conflict in testimony. However, it is dangerous to speculate whether appellant would have testified, given the circumstance that the only significant affirmative evidence against him was the accusation by MSgt Walls and given Walls' apparent interest in satisfying the prosecution in any way he could. The defense might well have elected to rest at the conclusion of the prosecution's case, gambling on a failure of proof. Above all, trial counsel never should have been permitted to parade the father's current legal difficulties before the members, for such information was absolutely irrelevant to the case.

It is interesting to note, moreover, that trial counsel's claim that appellant's father was a "crook" is not borne out by the record. At the time of appellant's trial, the father had been indicted and incarcerated, not tried or convicted. Further, as appellate defense counsel now inform us—without contradiction from appellate government counsel—the father was subsequently acquitted on all charges. In other words, this record is devoid of evidence contradicting appellant's view that his father was not a crook.

Be that as it may, the spectre of a Stroup crime family so dominated this court-martial that 2040 pages into the record of trial, when a court member submitted a question as to "the date of conviction" for appellant's father, the military judge himself had to be reminded that there had been no trial and no conviction. Indeed, it is accurate to state that the primary focus of this court-martial, from the very outset, centered around the alleged criminality of appellant's father, appellant's alleged lack of candor in discussing his father's predicament, and the implication that the father's criminal activities and appellant's dishonesty with respect thereto somehow tended to prove that appellant was involved in the RAF Lakenheath conspiracy.

Relevance, whether pertaining to speedy trial or the elements of the offense, was simply not a potent principle at this court-martial.[8] Rather, presumably to compensate for thin evidence, a runaway trial counsel—unfettered by the military judge upon whom ultimate blame for this unethical trial conduct must squarely rest—attempted to capitalize on every opportunity—and he was given many—to simply bash appellant.[9] *See* Mil.R.Evid. 611(a);

---

**8.** Of the numerous anecdotal examples available, perhaps the most pathetic related to trial counsel's attack on appellant's parish priest. He was called as a defense character witness in response to the barrage of character assassination brought about by the prosecution, and the witness testified briefly as to appellant's rather substantial involvement in parish activities in Greece. As a result of his contact with appellant, the witness felt comfortable in opining that appellant was an honest and law-abiding person.

Trial counsel followed with a lengthy cross-examination, wherein he sought to demonstrate that the witness, a priest of 24 years, lacked an adequate basis to make such judgments about appellant. After a few questions were submitted by the court members, trial counsel returned to the fray. This time, he engaged the witness in an argument, spanning three pages in the record, over whether the witness, on observing St. Peter, would have been able to predict that the apostle would deny Christ three times or whether, observing Judas Iscariot, he would have foreseen the betrayal of Christ for 30 pieces of silver. Trial counsel's thesis, of course, was that, since the priest would have been unable to predict the disciples' failings, his judgment that appellant was an honest and law-abiding person was invalid—so far was this court-martial removed from the question of whether appellant had loaned his keys to Walls and Law!

**9.** The examples given in this opinion are merely illustrative; no attempt has been made to catalogue all of trial counsel's numerous and repeated transgressions and perspective lapses. One additional example, however, of the appalling misdirection of this court-martial is the following:

After days of prosecution cross-examination of appellant, during which his father was continuously dragged through the mud by innuendo, the defense requested that appellant's father be produced as a witness in an attempt to get the trial of the father out of the way so that the court-martial could begin to focus on the evidence regarding the charges at bar. Due to the senior Stroup's incarceration in the States, a

ABA Standards, The Prosecution Function § 3–5.7 (1980); Canon 3, ABA Code of Judicial Conduct.

The Court of Military Review was less than complimentary of both the attorneys and the military judge for their conduct of the case. 24 MJ at 765. Frankly, our review leaves no such impression with respect to individual defense counsel, who surely must have been baffled by what was happening. Although the intermediate appellate authorities paid lip service to their displeasure with this outrageous record of trial, uncharacteristically, the glaring errors were glossed over; and we were left

to unravel the snarl. One of the often-promoted strengths of the military justice system is that there are so many different levels of checks and review that abominations such as this cannot slip by.

The decision of the United States Air Force Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.[10]

Chief Judge EVERETT and Judge SULLIVAN concur.

video deposition had to suffice. Even here, however, the defense was made to pay a high price for this information.

At the deposition, during direct examination by the defense, Mr. Stroup briefly described appellant's upbringing and his own business activities, and he denied that the nature of his business involved illegality.

Cross-examination of Mr. Stroup was handled by a Government representative—not this trial counsel—who had been in contact with the United States Attorney's Office that was prosecuting Mr. Stroup. Initially, counsel's questions, over continuing defense objection, consisted of forcing Mr. Stroup to affirm the language of the federal indictment against him, including: that he was being charged with violations of the "RICO Act" (Racketeer Influenced and Corrupt Organizations, 18 USC §§ 1961–68); that he was charged with aiding and abetting the solicitation of murder of three individuals, one of them twice; that he was charged with conspiracy to commit premeditated murder of the same three individuals; that he was charged with submitting "a false and forged application for life insurance on the life of" one of the intended murder victims; and that he was "charged with conspiring to commit racketeering activities." In addition, counsel required Mr. Stroup to confirm the dates of his pretrial confinement and the amount of bail ($500,000).

Eventually, government counsel began to focus on what amounted to an attempted dress rehearsal of the federal case against Mr. Stroup. Counsel asked, for example, if it was not true that the witness was "contacted for an interview by an FBI agent, but ... chose not to speak with them relying upon rights to counsel[?]" The witness gave an affirmative response. Then counsel began to ask about names, dates, and events which counsel well knew to be connected with the federal charges. He launched into a lengthy series of questions about specific investments of specific clients; about the witness'

knowledge of specific individuals (including Robert Vesco!); and about specific financial dealings that the witness had allegedly undertaken, including "money laundering." Repeatedly, Mr. Stroup either denied the allegations, asserted his Fifth Amendment right against self-incrimination because the questions related directly to the charges pending against him, or asserted that he was unable to breach client confidentiality under the laws of the Cayman Islands.

None of these questions had anything to do with appellant's trial or, indeed, with the witness' testimony on direct examination. Not surprisingly, Mr. Stroup, who was not a lawyer, put it best:

> You are going on all of my business. I thought this was pertinent to Bruce's business. This is completely unrelated with my son.

But to no avail! For at trial, when the defense sought to introduce the deposition *sans* prejudicial irrelevance, they were rebuffed. Except for a few insignificant deletions, the military judge succumbed to trial counsel's powers of persuasion and let it all in: the litany of Mr. Stroup's federal indictment, his repeated invocation of the Fifth Amendment, and the thinly-disguised innuendos about numerous financial improprieties. Again, trial counsel justified it with the sweeping assertion that it only went to the witness' credibility—

> The witness' credibility is a matter that can properly be explored we contend to include specific acts of his which may reflect upon his credibility and there was a good faith basis for asking the question.

10. As appellant has already served such confinement as was adjudged, and as, in our judgment, he and the military justice system have been grievously disserved, it may be impossible to afford him a fair and impartial trial at this point. However, that is a judgment which must be made by the appropriate convening authority.