**UNITED STATES**

v.

**Master Sergeant Ralph NIXON, FR 290–36–0501, United States Air Force.**

**ACM 27523.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 8 Dec. 1988.

Decided 7 Nov. 1989.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain Paul M. Dankovich.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Major Terry M. Petrie and Captain Morris D. Davis.

Before HODGSON, SPILLMAN and PRATT, Appellate Military Judges.

## DECISION

HODGSON, Chief Judge:

For sometime the appellant suspected, with apparent good reason, that his wife was having an affair with George Freeman, a co-worker at a janitorial service firm where she worked. About a week before her death, the appellant told a friend that if it were true about Freeman and his wife, "somebody could get hurt." The appellant also stated that if his "[wife] could make him angry enough, he would pick her up and throw her across the yard." The day before his wife's demise, the appellant telephoned Freeman and told him that "when he got through with [his wife], [Freeman] was going to need a paper sack to put her head in ... because he was going to crush it."

On the evening of 16 August 1988, while Mrs. Nixon was at work, Freeman's former girl friend appeared and assaulted a co-worker under the impression she was Mrs. Nixon. Freeman told Mrs. Nixon and the co-worker to leave as he did not know what his former girl friend might do. A short time later the appellant arrived looking for his wife—she had asked him to bring her some fried chicken. He was told what happened and left to find her.

The appellant's path and that of his wife crossed at the intersection of Doolittle and Arnold Avenues on Tinker Air Force Base. They parked alongside each other in an indented parking area near the intersection. The appellant was again told of the incident at work and became very angry— yelling and swearing. Mrs. Nixon left the car she was in and got in the passenger's side of the appellant's car next to her daughter, Juliet. Mrs. Nixon and the appellant argued with Mrs. Nixon denying any involvement with Freeman.

The appellant got out of the car and his wife became frightened, opened the car door and ran across the street. He chased and caught her at the median. There are at least six witnesses, i.e., occupants of both cars and passers-by as to what happened next. All of them, with the exception of his stepdaughter, Juliet, testified that the appellant picked up his wife and threw her, head first, to the pavement. Juliet maintained that her father "accidently dropped" her mother.

MSgt Michael J. Depanian was returning to the base from a round of golf. His version of the incident is a consensus of the other witnesses' testimony. Depanian stated he saw a small woman or young girl running towards him. He saw the appellant catch her, pick her up, and throw her head first to the pavement. He indicated it was a "determined throw" and the appellant used his body to achieve the forcing motion. The woman did not slip out of the individual's hands nor was she dropped. She was thrown straight down with a "forceful throw."

The appellant took his wife to the base hospital where he told one attendant that "we got into a fight and [his wife] hit her head on the curb." He told another that "he pushed her down." Since Mrs. Nixon had intercranial bleeding she was immediately transported to an off-base trauma center for treatment. She was brain dead upon arrival.

Doctor Chai S. Choi is a forensic pathologist in the Office of Chief Medical Examiner for the state of Oklahoma. She has performed over 2000 autopsies, 500 of which were homicides. According to Dr. Choi's testimony, Mrs. Nixon died as the result of a skull fracture that was seven inches in circumference. Additionally, she had a subdural hematoma and contrecoup injuries to the brain. She also had several bruises to her back, right shoulder, hip and leg. The injuries to her head, back, shoulder, hip and buttocks all occurred at the

same time. Some of the bruises on her body were consistent with being forcefully grabbed. Mrs. Nixon's injuries were consistent with being forcefully thrown to the ground, and inconsistent with a simple fall from three to four feet. Dr. Choi stated the cause of death was "Blunt Force, Traumatic head injuries." She also stated that the death was a homicide as opposed to accident or suicide.

The appellant, in his testimony, acknowledged suspecting that his wife and Freeman were having an affair, but stated he was not jealous or angry with her. He denied making any threats against his wife. He maintained that when his wife ran from the car he chased her because he was afraid she might get hurt in the traffic. When he caught her, he picked her up to bring her to the car, and she accidently fell from his arms. He had no intention of hurting her.

The above circumstances resulted in the appellant's conviction of unpremeditated murder. He was sentenced to a bad conduct discharge, seven years confinement, and reduction to airman basic. Appellate defense counsel have assigned five errors which will be discussed below.

## I

Appellate defense counsel argue that the trial judge erred by admitting various inflammatory photographs of the victim without a proper foundation. At trial, the defense expressly waived the requirement that the prosecution properly authenticate the photographs by stating "We're are not objecting on foundation or on other bases ... [W]e're not requiring an alert photographer to come in or anything of that nature." In view of this clear waiver at trial of a foundation objection, we will assume that this assigned error is grounded on the premise that "photographs are not admissible for the illegitimate purpose of inflaming or shocking the court-martial." *United States v. White*, 23 M.J. 84, 88 (C.M.A.

1986). The appellant further argues that since the pathologist referred to only three of the contested photographs it is apparent that the prosecution had no legitimate purpose in offering them.

The trial judge admitted 20 color photographs relating to the charged offense. There was no objection to six of them. The remaining 14 were photographs of injuries to the victim's head, kidney *, back, and buttocks. They also included photographs of the crime scene and the back seat of the appellant's car showing blood spots. The photographs of the victim's lower back and arm were not challenged.

■ Trial judges are given broad discretion in admitting photographic evidence of a stark and graphic nature where the record supports a finding that such evidence had a legitimate evidentiary purpose and its probative value outweighs the risk of unfair prejudice to the accused. *United States v. Mobley*, 28 M.J. 1024 (A.F.C.M.R. 1989). The contested photographs are not pleasant to look at, but neither are they excessively gory. The law is that an "appellant has no right to claim that, because of the gruesomeness of his crime, the trier of fact may not consider evidence as to how the crime was committed." *United States v. Matthews*, 16 M.J. 354, 363 (C.M.A.1983).

■ What legitimate purpose did the photographs serve? The appellant contended that his wife "slipped" from his arms and fell to the pavement from a distance of three to four feet. The nature and extent of the injuries she sustained would tend to negate any claim of accident, and would indicate instead that the injuries were deliberate and done with great force. *See United States v. Jones*, 14 M.J. 1008 (A.C.M.R.1982). The contested photographs were relevant, probative of critical issues, and not unduly prejudicial. The trial judge did not abuse his discretion in admitting them. *United States v. White, supra.*

---

* The victim was an organ donor, and one of the photographs showed an incision in the area of the kidney. There was some question as to whether the incision was part of the autopsy protocol or if the kidney had been removed. In any event, the trial judge gave a cautionary instruction to the members concerning this photograph and the one showing the head injury.

## II

The appellant contends that the trial counsel's misconduct eroded his right to a fair trial and due process of law. He identifies seven specific areas which he argues were "designed to whip the members into a frenzy of rage against the appellant." While we find no merit either separately or *in toto* in this assertion, a discussion of each allegation is appropriate.

■ Initially, appellate defense counsel claim that the prosecution improperly questioned the members during *voir dire* on their views of the sanctity of life. In particular, trial counsel questioned the members whether they believe that Asian societies placed a lower premium on human life. Apparently, these questions were motivated by the fact that Mrs. Nixon was a Filipino. All members agreed that human life was a precious commodity. Later, over defense objection, the trial counsel was permitted to inquire if any court-member was opposed to capital punishment. The one member who opposed capital punishment was peremptorily challenged.

Appellate counsel urge that the only purpose for this question was "to portray the appellant as a heinous criminal" and "to inflame the court and to undermine the guarantees of a fair trial."

The main purpose of *voir dire* is to lay a foundation so that challenges can be wisely exercised. *United States v. Smith*, 27 M.J. 25 (C.M.A.1988). A trial judge is allowed the widest possible discretion in this area. An appellate court cannot substitute its judgement as to what should have been done at trial unless it appears that the trial ruling was *manifestly unreasonable or arbitrary*. *United States v. Freeman*, 15 U.S.C.M.A. 126, 35 C.M.R. 98 (1964). The military judge's ruling in this area was neither manifestly unreasonable nor arbitrary. Since the judge properly allowed the questions, we will not fault the trial counsel for asking them.

Appellate counsel next urge that the photographs previously discussed were offered by trial counsel for "no purpose other than to shock and horrify the members." In Part I of this opinion we held that the contested photographs were properly admitted. Further discussion is not needed.

■ At the close of the trial counsel's opening statement, which covered approximately nine pages in the record, he repeatedly asserted that the appellant had murdered his wife by crushing her head. Trial defense counsel's objection that the opening statement had become a closing argument was sustained by the trial judge who later gave a curative instruction. Appellate defense counsel now contend that the opening statement "was designed to inflame the passions of the members," and constituted a further example of overzealousness. This claim of foul misses the mark. The appellant was charged with the unpremeditated murder of his wife by throwing her to the ground with sufficient force that her skull was fractured, i.e., crushed. The word picture drawn by the prosecutor was vivid but accurate. His opening statement may have crossed the line and become a closing argument, but when the judge sustained the defense objection, the matter was dropped and the opening statement concluded.

■ During the direct examination by trial counsel, the appellant's stepdaughter indicated that her "Dad picked her Mother up and ... accidently dropped her." Further in the examination trial counsel asked the girl if she had not previously told an aunt that "Daddy killed my Mommy." Appellate counsel argue that the trial counsel "sought to poison the trial with the highly emotional, and inadmissible testimony" of the stepdaughter that the appellant had killed his wife. First, it would appear that the witness's earlier statement to her aunt that "Daddy killed my Mommy" impeaches her trial testimony that the incident was an accident. As such, the question was proper. Mil.R.Evid. 607 permits the attacking of the credibility of a witness even by the party calling the witness. In any event, the trial judge sustained the defense objection, and the trial counsel asked no further questions in this area.

■ That portion of the Death Certificate prepared by Dr. Choi indicating that

Mrs. Nixon's death was the result of a homicide was masked prior to offering it in evidence. After Dr. Choi testified that in her opinion Mrs. Nixon's death was a homicide, not an accident, trial counsel asked the judge to unmask the exhibit prior to giving it to the members. The trial judge saw no prejudice in giving the members an unmasked copy since the exhibit was consistent with Choi's testimony. He then determined the exhibit was unnecessary and declined to admit it. Appellate defense assign the trial counsel's conduct, in asking the judge to admit the unmasked document in front of the members, to the rubric of general unfairness as it leaves the impression that the appellant is hiding something. We are hard pressed to discern any prejudice in this situation. First, Dr. Choi had testified that the death was the result of a homicide, and second, a report from the Armed Force Institute of Pathology, admitted without objection, also diagnosed Mrs. Nixon's death as a homicide.

The trial counsel's cross-examination of the appellant was interrupted numerous times by objections from trial defense counsel. At one point, trial counsel became annoyed with the interruptions and suggested that the defense counsel was trying to protect the appellant. The trial judge cautioned both counsel about making extraneous comments and the trial proceeded without further incident. Appellate defense counsel now urge that the "trial counsel's actions were a deliberate affront to the appellant's exercise of his constitutional rights." In this same general vein, appellate counsel argue that the prosecutor overstepped the bounds of propriety and fairness by seeking to "confuse the court through [Merecedes] Bayton's testimony." Mrs. Bayton was the victim's aunt and had lived with her and the appellant while he was stationed in the Philippines. She stated that the appellant had assaulted his wife and pushed her down stairs while stationed overseas. Appellate counsel maintain that Mrs. Bayton's memory was faulty and her lack of communicative skills were such that it was unfair for the Government to call her as a witness. A witness's memory and recollection can be tested through cross-ex-

amination. Further, there was no objection at trial that her command of English was flawed. Nor is there any basis for appellate counsel's suggestion that the trial judge should have, *sua sponte*, declared her incompetent to testify.

This was a hotly contested trial, and both sides vigorously and aggressively urged their positions. While the Government cannot hit below the belt, neither is it required to use only one hand and strike only harmless blows. We have carefully reviewed this transcript and the areas where the appellant claims the prosecutor took an unfair advantage. Here the actions of government counsel in no way approach the misconduct that the Court of Military Appeals so soundly condemned in *United States v. Stroup*, 29 M.J. 224 (C.M.A.1989). The appellant received a fair trial and one free from prosecutorial misconduct.

### III

■ The trial judge permitted Dr. Choi, the forensic pathologist, to testify that in her opinion Mrs. Nixon's death was a homicide. He overruled a defense objection that her answer went to the ultimate issue in the case. *See* Mil.R.Evid. 704.

Appellate defense counsel argue that "homicide" is a generic term for murder, and this coupled with Dr. Choi's conclusion that Mrs. Nixon's death was not the result of an accident, destroyed the appellant's defense that his wife died accidentally. He suggested that the six eyewitness accounts of how Mrs. Nixon died were unreliable for a variety of reasons, and that Dr. Choi's testimony was "the only significant and objective evidence on the appellant's intent."

"Homicide" refers simply to causing the death of another human being. A homicide is not murder unless the act is unlawful and done with malice. *Holloway v. McElroy*, 632 F.2d 605 (5th Cir.1980).

Dr. Choi's testimony did not encompass the issue of whether Mrs. Nixon's death was murder. Dr. Choi indicated only that the injuries were consistent with her being forcibly thrown to the ground and incon-

sistent with a simple fall. She gave no opinion as to who threw the victim to the pavement. Her testimony did not express a view as to the appellant's guilt or innocence any more than a fingerprint expert does when he states that the prints on the knife found in the victim's back matched the accused's. *See United States v. Lingle*, 27 M.J. 704 (A.F.C.M.R.1988) (Expert testimony that a spiral fracture requires an exceptional degree of force and is not a common childhood injury. Evidence given in a trial for alleged child abuse). Additionally, there was uncontested evidence before the members in a report from the Armed Forces Institute of Pathology that Mrs. Nixon's death was a homicide.

The record contained overwhelming evidence from which the members could have concluded that the appellant caused the injuries that resulted in his wife's death. Whether his conduct amounted to unpremeditated murder remained with the members under proper instructions. There is no indication in this record that the members abandoned their responsibility to decide this issue on the basis of Dr. Choi's testimony. *See United States v. Wynn*, 23 M.J. 726 (A.F.C.M.R.1986). The acceptance or rejection of expert testimony under Mil. R.Evid. 704 lies in the sound discretion of the trial judge. We see no abuse of discretion here.

### IV

■ At trial the appellant contended that his wife's death was the result of "a tragic, bizarre accident," and he was not angry or jealous over her relationship with Freeman. On appeal he maintains that his actions were the end product of provocation brought about by knowledge of her infidelity which "plunged him into the grips of an all-encompassing emotional force." Thus the evidence only supports a conviction for voluntary manslaughter rather than unpremeditated murder. We are asked, therefore, to affirm the lesser offense of voluntary manslaughter.

Assuming, *arguendo*, that the defense may assert one theory at trial and another on appeal, *see generally United States v.*

*Ward*, 49 C.M.R. 111 (N.C.M.R.1974), we are, nevertheless, convinced beyond a reasonable doubt that the appellant is guilty of murder. The transcript contains abundant evidence to support this conclusion. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

### V

Finally, appellate counsel argue that the trial judge denied the appellant a fair hearing on sentencing by instructing the members on the collateral consequences of various sentencing alternatives.

In fulfilling their responsibilities, the court members asked the judge when certain sentencing alternatives would take effect and the consequences to the appellant's family. It is apparent that they were striving to arrive at a punishment that would be appropriate and just. The defense did not object to the judge's instructions which were fair and accurate. We find no error in the judge's response to the member's questions. *United States v. Griffin*, 25 M.J. 423 (C.M.A.1988).

For the reasons stated, the findings of guilty and the sentence are

AFFIRMED.

SPILLMAN and PRATT, JJ., concur.