UNITED STATES

v.

**Second Lieutenant Peter L. SLOAN,
036–40–9112 FR, United States
Air Force.**

**ACM 27720.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 21 Oct. 1988.

Decided 29 March 1990.

Appellate Counsel for the Appellant: Mr. James M. Sloan, III, Providence, R.I.; Colonel Richard F. O'Hair; Major Ronald G. Morgan and Lieutenant Colonel Frank J. Spinner.

Appellate Counsel for the U.S.: Colonel Joe R. Lamport; Colonel Robert E. Giovagnoni and Captain Morris D. Davis.

Before HODGSON, SPILLMAN and PRATT, Appellate Military Judges.

## DECISION

HODGSON, Chief Judge:

The appellant is an instructor pilot assigned to Vance Air Force Base which is near Enid, Oklahoma where he resided in a

rented townhouse with two fellow officers, First Lieutenant Steven Steadman and First Lieutenant David Updegraff.

On 5 April 1988, the appellant saw the flight surgeon who assigned him duties not involving flying (DNIF) because of a stomach disorder. The next evening, 6 April, he felt well enough to have a date with Audrey Caulkins, a waitress at a local bar and part-time real estate agent.

After an evening on the town the appellant and his date returned to his home in the early hours and subsequently went to bed. The next morning, 7 April, the appellant again saw the flight surgeon who continued him in DNIF status. The appellant returned home about 1000 hours and Steadman saw him walking around their swimming pool. A few minutes later, when Steadman entered the dining room, he found the appellant lying on the floor "pale, sweating quite a bit and breathing real fast." Steadman nudged the appellant with his foot, but got no response. After being shaken, the appellant opened his eyes, which were glazed, and began "babbling" incoherently.

Concerned with his roommate's health, Steadman called the telephone operator to report an emergency. By the time Steadman was off the phone, the appellant had a 32 ounce can of beer in his hand and was heading up the stairs stating, in a slurred voice, that he was going to bed.

A few minutes later Thomas Britt and Roger Hess arrived from the Life Emergency Medical Services. When they entered the appellant's bedroom accompanied by Steadman, the appellant asked the medical technicians if they were "policemen." Both technicians testified that the appellant was "flushed, red faced with bloodshot eyes." He denied taking any medication. Reports as to the appellant's exact words, when asked what had happened, vary. According to Britt, the appellant said: "Last night I was at a party and I experimented with too much cocaine." Hess remembers the appellant saying: "I was experimenting a little too much cocaine last night." The appellant also acknowledged that his conduct hurt his career, and additionally stated, "[I don't] even know why [I] was using it because [I can't] really afford it. It [is] too expensive." Steadman recalls the appellant saying, "I took too much cocaine last night."

On 8 April, the appellant returned for a follow-up appointment with the flight surgeon. He made no mention of what had happened the day before. That afternoon the appellant told Updegraff that he was sorry for putting him and Steadman in such a "mess." He indicated he had "tried cocaine for the first time and realized how stupid it was." Later, when Steadman consented to having his part of the house searched by law enforcement authorities, the appellant indicated to Steadman that he (Steadman) need not worry because "he (appellant) did not do cocaine in the house."

Major (Dr.) Jay Mayer is an Air Force physician employed part-time by St. Mary's Hospital in Enid. On 9 April, Thomas Britt, the emergency medical technician who responded to Steadman's call for assistance on 7 April, told Mayer about the incident involving the appellant. Britt indicated to Mayer that the appellant had stated he had been "experimenting with a new dose of cocaine and had taken too much." The next day, 10 April, Mayer told the staff judge advocate what he had learned. This officer spoke with Britt and then contacted the base commander. On 11 April, after being informed that cocaine metabolites can stay in a person's system for three to five days after ingestion and that Britt and Hess were reliable, the commander determined that probable cause existed to seize the appellant's urine. His urine sample tested positive for benzoylecgonine, a metabolite of cocaine at a level of 4,335 nanograms per milliliter (ng/ml).

At trial the appellant denied using cocaine during the period alleged or at any time. He testified he had no recollection of the statements attributed to him by the emergency medical technicians (EMT) concerning his involvement with cocaine. He stated he became "queasy" after he had returned from the flight surgeon's office on the morning of 7 April and had called Audrey Caulkins to tell her he was sick.

At that time she told him, "I put a bunch of cocaine in your drink last night." He did not discover she was joking until about a week later. The appellant suggests that his statements to the EMTs and Steadman were the result of him being falsely told by Caulkins that she had put cocaine in his drink. Further, he did not remember any conversation with Updegraff about him (appellant) having tried "cocaine for the first time and realiz[ing] how stupid it was."

The appellant also challenged the reliability of the Air Force's drug testing procedures by offering expert testimony as to the accuracy of the tests. Additionally, he offered the results of a test run on his blood, taken the same time as his urine, which was negative for cocaine metabolites. He also presented medical testimony that the symptoms he displayed on 7 April were not indicative of a cocaine overdose.

In rebuttal the prosecution tendered testimony as to the appellant's reputation for untruthfulness, and that he had previously used cocaine with an enlisted Air Force member and two civilians, one of whom was Audrey Caulkins. The prosecution also offered testimony that the absence of cocaine metabolites in the appellant's blood was not significant as the metabolites remain in the urine longer than they do in the blood.

The above circumstances resulted in the appellant's conviction for a single allegation of cocaine use. The sentence as approved by the convening authority extends to a dismissal, two years confinement, and total forfeitures.

The appellant has assigned eight errors. While none justify overturning his conviction, a discussion of some is warranted.

I

■ The appellant challenged eight of the nine court members for cause at the conclusion of the *voir dire.* The trial judge granted two of the challenges and each side exercised its peremptory challenge. Appellate counsel now argue that the military judge erred by not granting all of the challenges for cause. Their attack focuses

on three areas: (1) Some members had heard rumors about the case; (2) two members worked for an individual who had spoken disparagingly of the appellant; and (3) several members thought the justice system was unable to cope with the drug problem in America. In light of these circumstances, appellate counsel argue that the court members' assurances that they could fairly hear the evidence in the case flys in the face of common sense. *See United States v. Smart,* 21 M.J. 15 (C.M.A. 1985).

In *United States v. Hawks,* 19 M.J. 736, 738 (A.F.C.M.R.1984), we stated:

> [C]hallenges for cause can test the mettle of the most experienced and conscientious judge, as he must weigh competing principles and make a ruling quickly and without the time for reflection that appellate courts are given—the task is not easy. On one hand he is admonished to be liberal in passing on challenges, and on the other hand reminded that the moving party has the burden of proof to establish the contention of bias as fact, not speculation. He is also urged to insure that his ruling on the challenge does not give rise to a "perception of unfairness which reasonable men would draw from a given member remaining on the court." It is because of the many factors he must consider, that his ruling denying a challenge for cause will be reversed on appeal only if there is a clear abuse of discretion. [citations omitted.]

■ Court members are encouraged to be candid and open during the questioning that determines their qualifications to sit. Such candor is desirable and a member who displays such frankness is not automatically disqualified if it is clear that any personal bias he possesses will yield to the evidence and the judge's instructions. *United States v. Reynolds,* 23 M.J. 292 (C.M.A. 1987). In this situation the trial judge is in a position to observe the member's demeanor as he answers questions probing his fairness. *United States v. Smart, supra.*

■ That members had heard "rumors" about an alleged offense is not a *per se*

basis for challenge. *See United States v. Cline*, 20 C.M.R. 785 (A.F.B.R.1955); *pet. denied* 20 C.M.R. 785 (C.M.A.1955); *see also United States v. Baquex*, 2 C.M.R. 424 (A.B.R.1951). The test is whether as a result of those rumors the court member had formed an opinion as to guilt or innocence. Here there is no indication that the "rumors" about the appellant led the members to conclude he was guilty. *United States v. Mayes*, 28 M.J. 748 (A.F.C.M.R. 1989).

■ Working for someone who thinks ill of the accused is also not a *per se* disqualification. *Cf. United States v. Murphy*, 26 M.J. 454 (C.M.A.1988) (*per se* rule of disqualification is not required for a senior member of court-martial who writes or endorses efficiency report of a junior member). This is particularly true where there is no indication that the members were aware of their commander's viewpoint.

■ As we stated earlier, court members are expected to be frank and open during *voir dire*. For this reason it is not surprising that the members stated they thought the drug problem in America had reached a crisis level. *See generally United States v. Holt*, 28 M.J. 835 (A.F.C.M.R.1989). If they had indicated otherwise there would have been a serious doubt whether the questions were being answered honestly. But distaste for an offense does not disqualify a court member if he or she is mentally free to render an impartial finding and sentence based on the law and the evidence. *United States v. Tippit*, 9 M.J. 106 (C.M.A.1980); *United States v. Karnes*, 1 M.J. 92 (C.M.A.1975). Here the members indicated they were open-minded and would render findings and, if needed, impose a sentence based on the evidence before them.

The crucial issue is not whether this Court would have granted the challenges, but if the trial judge, who was there, and saw and heard the *voir dire*, clearly abused his discretion by denying the challenges. In *United States v. Travers*, 25 M.J. 61, 62 (C.M.A.1987), Judge Cox pointed out that:

> To reverse for "an abuse of discretion involves far more than a difference in ... opinion.... The challenged action must ... be found to be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous' in order to be invalidated on appeal." *Quoting United States v. Glenn*, 473 F.2d 191, 196 (D.C.Cir.1972).

Applying the standard just recited, we conclude the trial judge did not err in denying the appellant's challenges for cause. However, we ask all trial judges to pay special heed to Senior Judge Kastl's admonition in *United States v. Jobson*, 28 M.J. 844, 849 n. 1 (A.F.C.M.R.1989); *pet. granted* 28 M.J. 439 (C.M.A.1989).

## II

■ The appellant contends that his urine sample was inadmissible because: (1) there was no probable cause to seize the specimen; and (2) the commander who ordered the seizure was not a neutral and detached magistrate.

The commander, Colonel P.D. Leonard, based his search authorization on information that the appellant had ingested cocaine and that the alleged use occurred within the preceding three to five day period so that cocaine could still be detected. This information came from the two EMTs, Britt and Hess, who responded to a call for help from the appellant's house. Leonard was also told by Dr. Mayer, the individual with whom Britt had discussed the incident, that cocaine metabolites could remain in urine "three days ... up to five days, but beyond that it was very unlikely that it could be found."

Appellate defense counsel argue that Britt and Hess were never shown to be reliable and trustworthy and the representation that they were "two good solid citizens" was an "elaborate charade" designed to mislead the commander into believing that probable cause existed.

■ We disagree. Britt and Hess were not routine informants [i.e., members of the criminal community], but "citizen-witnesses" reporting an illegal act. Information from such sources is presumed reliable. *United States v. Wood*, 25 M.J. 46 (C.M.A.1987); *United States v. Rhea*, 29

M.J. 991 (A.F.C.M.R.1990); *United States v. Ozanich*, 27 M.J. 585 (A.F.C.M.R.1988). It should also be remembered that these two individuals were not relaying hearsay information about what the appellant had said, but had actually heard him say it. Accordingly, we hold that Leonard had ample basis to conclude that the information provided by Britt and Hess was reliable and could be considered in determining whether probable cause existed to seize the appellant's urine.

Appellate defense counsel also suggest that Dr. Mayer's assertion that benzoylecgonine could be detected in urine up to five days was false. They asserted that the information about the possibility of cocaine metabolites being in the appellant's urine was "stale," and could not be used to support a search authorization.

While studies in this area * suggest that the detection of cocaine metabolites in humans is usually not possible more than three days after ingestion, the expert witnesses offered by the government and the defense at trial acknowledged that detection four days after ingestion is not unreasonable. Further, all agreed that the greater the dosage, the longer the metabolite could be detected. Dr. Mayer's statement to Leonard as to the length of time cocaine can be detected in urine was medically sound. It clearly was not "a deliberate falsehood or a reckless disregard for the truth." *United States v. Winters*, 18 M.J. 609 (A.F.C.M.R.1984); *pet. denied* 19 M.J. 99 (C.M.A.1985). We hold that the commander could conclude from facts given him that the appellant's urine *probably* contained cocaine metabolites. Hence, the information was not "stale". *United States v. Johnson*, 23 M.J. 209 (C.M.A. 1987); *see also United States v. Baur*, 48 C.M.R. 121 (A.F.C.M.R.1973).

Citing *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979), appellate defense counsel argue that the base commander participated in and directed the investigation into the appellant's alleged cocaine use, and there-fore he was not a "neutral and detached" magistrate.

■ In *Ezell* the Court of Military Appeals held that a military commander who issues a search authorization must be neutral and detached in the case in which he acts, and he may not authorize searches while he is performing investigative or prosecutorial functions. In summary, he must not be *personally* involved in the actual evidence-gathering process. *See United States v. Staggs*, 23 U.S.C.M.A. 111, 48 C.M.R. 672 (1974), and *United States v. Guerette*, 23 U.S.C.M.A. 281, 49 C.M.R. 530 (1975).

■ We are aware that a commander's decision to search is subject to closer scrutiny than those of a military judge or magistrate. *See United States v. Thompson*, 1990 WL 16543 (A.C.M.R.1990). However, here the commander did not instigate the investigation or devise the plan that ensnared the appellant. *See United States v. Cordero*, 11 M.J. 210 (C.M.A.1981) (commander arranged the loan of an automobile and permitted the continued use of an informant in the investigation of the accused). Rather, he sought information and advice as to the existence of probable cause that would permit the issuance of a search authorization. This, in our view, is not an investigation that would disqualify him from authorizing a search but is a proper discharge of his responsibilities to issue search authorizations only when he is convinced probable cause exists.

### III

■ The appellant maintains that the trial court erred in refusing to dismiss the charges against him because of "governmental conduct in [his] case including, but not limited to: (a) improper command influence; (b) intimidation and harassment of witnesses; (c) improper 'immunity' orders [being] obtained; and (d) witnesses [being] denied their right to counsel."

---

* *See generally* Ambre, *The Urinary Excretion of Cocaine and Metabolites in Humans: A Kinetic Analysis of Published Data,* Journal of Analytical Toxicology, Vol. 9, November/December 1985; Davelt & Chang, *Urinary Excretion of Cocaine and Benzoylecgonine Following Oral Ingestion in a Single Subject,* Journal of Analytic Toxicology, March/April 1987.

■ The trial judge required the appellant's trial defense counsel to make an offer of proof as to the evidence supporting the motion to dismiss. On appeal appellate defense counsel argue that the trial court was without authority to "demand" an offer of proof prior to allowing witnesses to testify. The appellant is mistaken on this point. Mil.R.Evid. 103(a)(2) which is identical to the federal rule, permits a trial judge wide discretion in this area. *See also United States v. Logan*, 18 M.J. 606 (A.F.C.M. R.1984). The appellant's offer of proof dealt mainly with his assertion that the government intimidated Steadman and Updegraff, key prosecution witnesses, by imposing non-judicial punishment on them prior to trial, denying them the right to confer with counsel, and giving them grants of immunity without clearing the matter with the Department of Justice. On this latter point, the appellant is again mistaken. A general court-martial convening authority may grant immunity to *any person* subject to the Code without referral to the Justice Department except in specific situations, none of which apply here. R.C.M. 704; *see also United States v. Villines*, 13 M.J. 46 (C.M.A.1982).

Appellate defense counsel maintain that after considering the appellant's offer of proof, the trial judge denied the motion to dismiss in a manner that was both "arrogant and impatient [and] represented nothing more than an effort to cover-up embarrassing incidents at Vance AFB." They also claim, metaphorically, that the "military judge took off his black robe and wore his uniform as an Air Force officer and attempted to keep out testimony of improper conduct at the highest levels of command at Vance AFB." This is strong language and would, if true, warrant our strongest censure. *See generally United States v. Charles*, 15 M.J. 509 (A.F.C.M.R. 1982).

The record, however, does not justify such an indictment. It is an article of faith that unlawful command influence is the mortal enemy of military justice. *United States v. Thomas*, 22 M.J. 388 (C.M.A. 1986); *United States v. Rodriguez*, 16 M.J.

740 (A.F.C.M.R.1983). In *Thomas,* Chief Judge Everett stated:

The exercise of command influence tends to deprive servicemembers of their constitutional rights. If directed against prospective defense witnesses, it transgresses the accused's right to have access to favorable evidence. If directed against defense counsel, it affects adversely an accused's right to effective assistance of counsel. If the target is a court member or the military judge, then the tendency is to deprive the accused of his right to forum where impartiality is not impaired because the court personnel have a personal interest in incurring reprisals by the convening authority due to a failure to reach his intended result. (citations omitted.)

22 M.J. at 393.

■ The gist of this assigned error is that key government witnesses were not provided counsel prior to making statements that incriminated the appellant, and were thereafter forced to testify against him under grants of immunity. As stated above, the specter of unlawful command influence is that court-members will return a guilty finding through fear of reprisal, defense counsel will fear to aggressively represent their clients, and witnesses favorable to an accused will be reluctant to speak in his behalf. The offer of proof submitted by the trial defense counsel disclosed none of these evils. Accepting, *arguendo,* that Steadman and Updegraff were refused counsel prior to being interviewed by law enforcement agents, any rights violation they suffered was not transferable to the appellant. *See United States v. Davis*, 22 M.J. 651 (A.C.M.R. 1986). In our view, the appellant's offer of proof presented no issue of unlawful command influence. Thus, the trial judge correctly denied the motion to dismiss.

### IV

Appellate defense counsel claim that the trial counsel was "sarcastic, overbearing, bombastic, misstated evidence, appealed to the prejudice of the court and panel, and acted in a way to deprive [the appellant] of

a fair trial." In summary, the appellant argues that the trial counsel's courtroom behavior was a textbook example of prosecutorial misconduct.

 In our system a prosecutor has a double burden—the obligation to conduct the government's case zealously, and the obligation to try that case fairly and with due regard to the rights of the accused. The test for reversible prosecutorial misconduct has two parts: (1) prosecutor's remarks or conduct must in fact be improper; and (2) such remarks or conduct must prejudicially affect the accused's substantial rights so as to deprive him or her of a fair trial. *United States v. Hernandez*, 779 F.2d 456 (8th Cir.1985). Further, the alleged misconduct must be evaluated in the context of the entire trial. Prosecutorial improprieties are not reversible error unless they are so gross as to prejudice the accused, and the prejudice is not neutralized by the trial judge. *United States v. Flake*, 746 F.2d 535 (10th Cir.1984).

 The appellant's specifically argues that the trial counsel made "snide, overbearing, and disrespectful comments" during the course of the trial, i.e., suggesting to the judge that the defense was "[hiding] the ball" in relation to evidence. A comment such as this is out of place in a court-martial, but since it was outside the presence of the members, we see no prejudice. We also note the trial judge admonished the prosecutor for this remark and others like it.

During his opening statement, the trial counsel indicated that "This was a sad and scary case about an instructor pilot using cocaine." Appellate defense counsel argue that this remark "was a subtle appeal to the bias and prejudice of the court members." We find nothing untoward in the statement, and the failure of the trial defense counsel to object leads to a reasonable inference that nothing improper was said. *United States v. Rodriguez*, 28 M.J. 1016 (A.F.C.M.R.1989).

 Appellate defense counsel also urge that the prosecutor's use of the pronoun "we" while referring to the urinalysis laboratory at Brooks was an insidious attempt to suggest to the members that they, the experts who testified for the government, and the prosecutor were all part of the "Air Force team," and the civilian expert witnesses who testified for the appellant were not. Thus, the prosecutor invited the members to treat the trial as the "Air Force v. Civilians." Again, there was no objection as to this assigned error. *United States v. Rodriguez, supra.* We find no sinister motive in the trial counsel's phraseology, although a more neutral term could have been used. *See generally United States v. Winters*, 18 M.J. 609 (A.F.C.M.R. 1984). The appellant also asserts that the trial counsel repeatedly violated the court's ruling as to the admissibility of evidence. As we have stated in earlier opinions our profession is a contentious one, and hotly contested cases such as this one, sometimes lead to minor departures from accepted courtroom decorum. When it occurred here the trial judge admonished the offending counsel and gave a curative instruction. For prosecutorial misconduct to warrant reversal it must be so pronounced as to permeate the entire trial. *United States v. Stroup*, 29 M.J. 224 (C.M.A.1989).

 Where there is overwhelming evidence of guilt—the state of the evidence here will be discussed later in this opinion—the likelihood of prejudice flowing from over-zealous trial tactics is lessened. *United States v. Pantoja–Soto*, 739 F.2d 1520 (5th Cir.1984).

Perfect trials are few and far between, and while this trial was not perfect, we are satisfied that the appellant was fairly convicted and the conduct of the trial counsel did not substantially affect his rights. *United States v. Nixon*, 30 M.J. 501 (A.F. C.M.R.1989).

### V

 An 18th century commentator on the English justice system once observed "That no man goes to the gallows with a good impression of the law." So it is true in the appeal before us. In his brief, the appellant characterized his trial as a "charade," and "a tale told by an idiot, full of

sound and fury, signifying nothing." The proceeding, in his opinion, "lacked dignity and self-discipline," and was orchestrated by parties "less interest[ed] in doing justice and more in obtaining a conviction." He suggests that a reasonable doubt exists as to his guilt.

The evidence as to the appellant's cocaine use is, without putting too fine a point on it, overwhelming. The key witnesses against him are either totally disinterested parties or close friends of his. He admitted to at least four people that he had overdosed on cocaine the night before. The two paramedics who responded to the emergency call for help from the appellant's roommate had no reason to lie or falsify what the appellant said to them. The appellant's roommates were close friends of his and initially said nothing about his admissions of cocaine abuse. The accuracy of the laboratory report that established a substantial level of benzoylecgonine in the appellant's urine was challenged through expert testimony offered by the defense. Where there are expert opinions on both sides of an issue, the weight to be given each expert opinion is a factual issue to be assessed by the factfinders in the same manner as other evidence. *SPESCO, Inc., v. General Electric Company,* 719 F.2d 233 (7th Cir.1983); *United States v. Ellibee,* 13 C.M.R. 416 (A.B.R. 1953). The conflicting opinions of the witnesses were submitted to the members under appropriate instructions. The members, after hearing all the evidence concerning the validity of the laboratory tests, and the statements made by the appellant to others, including his denial at trial of any cocaine use, found him guilty as charged. Proof beyond a reasonable doubt does not mean that the evidence is free from conflict. *United States v. Lips,* 22 M.J. 679 (A.F.C.M.R.1986); *pet. denied* 24 M.J. 45 (C.M.A.1987). We are convinced beyond a reasonable doubt that the appellant used cocaine as alleged. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

## VI

▮ A commissioned officer holds a position of special trust and responsibility and is expected to conduct him or herself in a manner that promotes respect and discipline. The appellant's use of cocaine clearly demonstrates a singular lack of leadership and the other qualities that are demanded of an officer. We consider the approved sentence to be appropriate for the offense of which the appellant has been convicted. *United States v. Trimper,* 26 M.J. 534 (A.F.C.M.R.1988), *aff'd* 28 M.J. 460 (C.M.A.1989); *United States v. Repp,* 23 M.J. 589 (A.F.C.M.R.1986), *aff'd* 24 M.J. 447 (C.M.A.1987); *cert. denied* 484 U.S. 1025, 108 S.Ct. 749, 98 L.Ed.2d 762 (1987).

The findings of guilty and the sentence are

AFFIRMED.

Judges SPILLMAN and PRATT concur.