UNITED STATES

v.

**Master Sergeant Tommy R. GABRELS, FR254–84–3065 United States Air Force.**

**ACM S28304.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 15 March 1990.

Decided 9 Aug. 1991.

Appellate Counsel for the Appellant: Major Ronald A. Gregory (argued), Colonel Richard F. O'Hair, and Lieutenant Colonel Jeffrey R. Owens.

Appellate Counsel for the United States: Captain Thomas E. Wand (argued), Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Lieutenant Colonel Brenda J. Hollis, and Major Paul H. Blackwell, Jr.

Before LEONARD, RIVES and McLAUTHLIN, Appellate Military Judges.

OPINION OF THE COURT

McLAUTHLIN, Judge:

Contrary to his pleas, Master Sergeant Tommy R. Gabrels was found guilty of using marijuana. He asserts four issues on appeal. Since we find that two of these, taken together, warrant reversal, it is unnecessary for us to address the others.

---

The only evidence of Gabrels' marijuana use was a test of a urine specimen provided after random selection. The specimen tested positive for tetrahydrocannabinol (THC). Before his special court-martial panel of officers, Gabrels did not contest the procedures or the science that led to the positive result. Instead, he built his defense around a 19–year, unblemished military record, impressive enough to earn him a rare STEP (Stripes for Exceptional Performers) promotion to master sergeant in 1986. He argued that the twenty-four hour advance notice he had of the test and the high nanogram level found in his sample equated to long term drug abuse, and this simply did not correspond with the qualities he had demonstrated in years of spotless service.

What Gabrels did not know, however, were the obstacles the government had ready to derail his defense. Individually, many of the government's tactics approached reversible error—combined they prevented Gabrels from receiving a fair trial.

## I

After the government rested, Gabrels took the stand. He told the members about his lengthy career, including his three overseas assignments. He talked about cross-training to the personnel career field and his current active duty assignment at the Air Force Reserve Headquarters at Robins Air Force Base, Georgia. He discussed his rural roots in northern Georgia where his wife and mother lived and where he commuted on weekends. Gabrels finished his direct testimony responding to his counsel's questions as follows:

Q: Have you ever been late to work getting to duty?

A: Not that I'm aware of, no, sir, never.

Q: You've never been counseled for it or anything?

A: No, I've never been late for work, no, sir.

Q: Have you ever received . . . a verbal counselling in terms of any misconduct—

A: No, sir.

Q: —on your part?

A: No, sir.

Q: Have you ever received a Letter of Reprimand?

A: No, sir.

Q: Article 15?

A: No, sir.

Q: Is this the first time you've faced a court proceeding?

A: Yes, sir.

Q: In all fairness, you did have a speeding ticket last year though, didn't you?

A: Yes, sir.

Q: Is that pretty much the only thing that you've done wrong since you've been in the Air Force?

A: I've never been counselled on anything in the Air Force, sir.

Gabrels concluded, denying he used marijuana during the charged time frame, or at any time.

## II

During cross-examination, the prosecutor asked Gabrels:

Q: Now, you don't mean to suggest to the members of the court when you say you've never done anything wrong in the Air Force and you never used marijuana, that you haven't associated with people who have done that. You have associated with people who have used marijuana, haven't you?

A: I work with people who have got picked up for some reason I heard later that had got busted with drugs. I have never really been involved with a situation that was there on the scene. I've been a urinalysis monitor myself.

Q: Okay, you mentioned to the members of the court earlier that not only your immediate family but your wife's family also live in Wiley [Georgia]. You were aware, were you not, Sergeant Gabrels, that your brother-in-law, [E], was convicted of possessing marijuana in his home in Wiley, weren't you?

A: No, ma'am.

Q: You were not aware of that?

A: [E] does not live in Wiley, Georgia.

Q: Does he live in Rabun County, Georgia?

A: He sure does, but that's—

Q: My question to you, Sergeant Gabrels, is you were aware, were you not, that your brother-in-law was convicted of possessing marijuana in Rabun County, Georgia?

A: No.

Q: You did not know that?

A: No, ma'am.

Q: Do you associate with [E]?

A: He's my brother-in-law. I'm married to his—him and his wife, you know, are sisters. I know [E].

Q: So the answer is "Yes, I do associate with him"?

A: Yes, ma'am.

. . . .

Q: You also spend a lot of time when you're up in Clayton County, Wiley or the other towns around Wiley with a man named [B], the owner of the ... Wild Life Range, is that right?

A: I know [B]. We were in school together.

Q: Do you consider [B] to be a friend of yours?

A: I would—not a close friend, no. I know [B].

Q: You spend quite a bit of time going—This is sort of like a zoo, isn't it, a wild life range where they have animals and you can go see them and visit them, bring your children to that, is that what this is?

A: He has a place there for that, yes.

Q: You spend some time with [B] whenever you go up to that area, don't you?

A: I've helped him with some animals, unloading some animals and loading animals and training some animals, yes.

Q: And you were aware, I assume, Sergeant Gabrels, that [B] has a federal conviction for possession, manufacture and distribution of marijuana last year, 1989, were you aware of that?

A: No, I don't believe that's true.

Q: You don't believe that's true?

A: No, I—It's news to me. I didn't know it. I mean he's there today.

In their brief, appellate government counsel now concede the "trial counsel was misinformed that the arrests [of 'E' and 'B'] resulted in convictions."

### III

The government's cross-examination of Gabrels continued:

Q: ... You just got through telling your attorney, Captain [P], that other than a speeding ticket that you received sometime last year to your knowledge you've never been in trouble since you've been in the Air Force, is that right?

A: I've never been in trouble with the Air Force.

Q: Isn't it a fact that in September of 1989 you were convicted of driving under the influence in Byron, Peach County, Georgia?

A: No, I was given a ticket after a softball game and I went to the hearing and the judge says, "You can plead guilty or you can file what they call a—and I don't know the exact term—*nolo contendere* and not admit to any guilt at all and settle it." I did that.

Q: And that was for driving under the influence, not for a speeding ticket, wasn't it?

A: Right.

Q: And you did not tell anybody at the Reserve Center or anybody in your command that you had made this court appearance, did you?

A: I don't recall telling no one.

Two months before trial, the defense counsel requested government records of "any uncharged misconduct" and stated that this was a continuing request. The prosecutor provided the defense with "the remaining discoverable materials" one week before trial. Nothing about Gabrels' "convicted" friends or the driving under the influence charge was included in this disclosure.

The prosecutor asked five of Gabrels' subsequent character witnesses if they were aware of Gabrels' drunk driving "conviction." None were. One of these witnesses was asked:

Q: You assume that someone in the Air Force chain of command must have known about that kind of civilian conviction, true?

A: I would—Right, I would suppose that they should have known about it or would have known about it, yes.

## IV

In closing argument, the prosecutor again referenced Gabrels' drunk driving "conviction:"

Probably *the most telling piece of evidence that you have heard* is the fact that this accused admitted to you under oath on the witness stand that he had been *convicted* of drunk driving in September of last year in Peach County in Byron, Georgia. None of [the character witnesses] knew about that, and those who were asked said, "Well, it wouldn't make any difference to me about his integrity or his stature as a noncommissioned officer." None of them knew about it. Ask yourselves why they didn't know about it, members of the court. It's not that hard to figure out. If he had let the people in his command know that he'd been convicted of drunk driving in a civilian community, do you think they all would have had the same opinion of him? Do you think that he would be able to come in here and represent to you that he has had an unblemished record? Obviously not. (Emphasis supplied.)

Later in closing argument, the prosecutor raised the drunk driving matter again, and then discussed Gabrels' "associations:"

Members of the court, you were—someone tried to lead you to believe, and that someone is this accused, through the case that he presented, that he's just not the kind of person who would associate with drug abusers. Well, now, what evidence do you have of that fact? You have his word and his word only, and when you evaluate the credibility of every witness who testified, we ask you to pay particular attention to the demeanor of the person who has the most to lose in this court-martial today, and that is Mas-

ter Sergeant Tommy Gabrels. This is a man who managed to somehow hide from his squadron the fact that he had a civilian conviction, the man that everybody is still willing to come in and say is honest, trustworthy and has integrity above reproach. You don't have any evidence whatsoever, one way or the other, to persuade you that he doesn't associate with people who use drugs.

After arguments by both counsel and instructions from the military judge, the court closed for the panel to deliberate. Seventeen minutes later, they returned to announce their findings of guilty.

## V

Analyzed separately, the prosecutor's actions concerning us today close in on the line separating harmless from prejudicial error. No objection was made when the prosecutor impeached Gabrels by linking him with allegedly convicted drug abusers. Viewed in a vacuum, this failure to object, coupled with trial counsel's acceptance of Gabrels' negative answer and the military judge's general pattern instruction that such questions do not constitute evidence, create an argument, at least, for harmless error. Any lack of relevance or undue prejudice arising from these questions might be considered waived. *United States v. Wilson*, 7 M.J. 290, 294 (C.M.A.1979); Mil.R.Evid. 103(a)(1), 403; R.C.M. 801(g). However, the situation here is very much aggravated because those "convictions" did not exist. *See United States v. Brooks*, 22 M.J. 441 (C.M.A.1986); *United States v. Weeks*, 20 M.J. 22 (C.M.A.1985). And the way trial counsel asked the question, "You have associated with people who have used marijuana, haven't you?" put Gabrels in a position not unlike the unfortunate man who is asked, "When did you stop beating your wife?"

Similarly, when observed in isolation, the government's failure to disclose its knowledge of Gabrels' civilian drunk driving plea at least pushes the limits of our scrutiny. When trial counsel asked the question appellant now complains of, there was no

objection for failure to provide discovery. Instead, defense counsel redirected appellant and another defense witness was called before defense counsel mentioned any non-disclosure problem. Even then, the defense seemed to be satisfied with a curative instruction explaining the effects of a plea of *nolo contendere.*

The government now contends "the situation would not have been significantly different with disclosure" of Gabrels' *nolo contendere* plea since "[t]he certified letter the government received [about the matter] was dated just the day before trial." Therefore, in the government's view:

> Even if the defense witnesses had been made aware of the information at that point, they would have had to admit that appellant did not reveal the information when the incident occurred months earlier. On the other hand, if they did not testify at all, appellant would have been in an even worse position.

Thus, the government asserts its failure to disclose Gabrels' drunk driving concession had no effect upon the validity of the proceedings. *See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481; *United States v. Eshalomi,* 23 M.J. 12 (C.M.A.1986).

### VI

■ Taken together, the prosecutor's actions in this case clearly constituted reversible error. "A military accused has the right to a fair trial in accordance with the Uniform Code of Military Justice." *United States v. Rowe,* 11 M.J. 11, 13 (C.M.A.1981). Cumulative error may impair the fairness of a trial and deny an accused due process of law. *United States v. Evans,* 18 U.S.C.M.A. 3, 39 C.M.R. 3 (C.M.A.1968); *United States v. Donohew,* 18 U.S.C.M.A. 149, 39 C.M.R. 149 (C.M.A.1969). *See also*

*United States v. Yerger,* 3 C.M.R. 22 (C.M.A.1952) *and United States v. Sloan,* 30 M.J. 741 (A.F.C.M.R.1990).

As our former Chief Judge Hodgson noted in *United States v. Sloan:*

> In our system a prosecutor has a double burden—the obligation to conduct the government's case zealously, and the obligation to try that case fairly and with due regard to the rights of the accused. The test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact be improper; and (2) such remarks or conduct must prejudicially affect the accused's substantial rights so as to deprive him or her of a fair trial. *United States v. Hernandez,* 779 F.2d 456 (8th Cir.1985). Further the alleged misconduct must be evaluated in the context of the entire trial. Prosecutorial improprieties are not reversible error unless they are so gross as to prejudice the accused, and the prejudice is not neutralized by the trial judge. *United States v. Flake,* 746 F.2d 535 (10th Cir.1984).

30 M.J. at 748. *See also United States v. Stroup,* 29 M.J. 224 (C.M.A.1989).

Here, the sum total of the prosecutor's actions deprived Gabrels of a fair trial. Proper disclosure of the drunk driving matter in response to the defense discovery request could have altered the defense case dramatically.[1] Disclosure would not have detracted from the government's argument that Gabrels hid this "conviction" from his superiors, while offering the defense an opportunity to explain Gabrels' obvious confusion about the nature of his *nolo contendere* plea. Undoubtedly, Gabrels would have been better prepared for questions about the meaning and effect of such a plea in the State of Georgia.[2] The defense could well have reconsidered the order of

---

**1.** We note here that while the government may have received a certified copy of the record of Gabrels' drunk driving conviction the day before trial, information about the conviction was no doubt available at a much earlier date—and certainly in time to respond to the defense discovery request.

**2.** In fact, our reading of the State of Georgia Criminal Code indicates that an accepted plea of

*nolo contendere* to drunk driving for a first time offender over the age of 18 is not considered a "conviction" in the State. Ga.Code Ann. 40-6-391 (1990). This may explain appellant's direct testimony that his court-martial was his first "court proceeding;" it could also explain why he said in cross-examination that he had not been *convicted* of driving under the influence.

its witnesses and reevaluated whether to call any character witness who felt Gabrels should have mentioned the matter to Air Force authorities. Certainly Gabrels was entitled to discover, before trial, what the prosecutor would call in closing argument "the most telling piece of evidence" against him.

 The failure to disclose impeachment evidence is enough to warrant appellate relief if the undisclosed information casts reasonable doubt on the validity of the proceedings. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Watson*, 31 M.J. 49 (C.M.A.1990); *United States v. Eshalomi*, 23 M.J. 12 (C.M.A.1986). The improper withholding of appellant's drunk driving plea raises this specter here.

Added to the deficient discovery was the prosecutor's disturbing impeachment of Gabrels by alluding to his "convicted" friend and brother-in-law. Even if a factual basis existed for this line of questions, the prosecutor's further cross-examination of Gabrels and closing argument may have inappropriately nurtured a finding of "guilt by association." *United States v. Wilson*, 7 M.J. 290, 294 (C.M.A.1979). If no factual basis existed for these questions, the prejudice is even more egregious. *See United States v. Brooks*, 22 M.J. 441 (C.M.A.1986); *United States v. Weeks*, 20 M.J. 22 (C.M.A.1985).

Much of the above could have been avoided with an Article 39(a) session before Gabrels' cross-examination. Out of the hearing of the members, the military judge could have weighed Gabrels' direct testimony against the discovery issue while considering the impact of the rule making evidence of *nolo contendere* pleas inadmissible. Mil.R.Evid. 410. An Article 39(a) session would also have given the judge the opportunity to assess the relevance of the alleged "convictions" of Gabrels' friend and brother-in-law, and balance any relevance found with the danger of undue prejudice. Mil.R.Evid. 402, 403.

Character evidence by itself may be sufficient to cause the factfinder to have reasonable doubt. *United States v. Vandelinder*, 20 M.J. 41 (C.M.A.1985). The trial counsel's surprise attacks upon Gabrels and five defense witnesses labeled the appellant a liar. These ploys prevented Gabrels from objectively putting his character before the trier of fact. Evaluated in the context of the entire proceedings, discovery and impeachment flaws combined, here, to deny appellant a fair trial.

## VII

The findings of guilty and the sentence are set aside. A rehearing is authorized.

Senior Judge LEONARD and Judge RIVES concur.